HOPKINS, J.T.C.
Plaintiff-taxpayer has appealed local property tax assessments for the years 1983, 1984 and 1985, alleging that it was substantially overassessed and that the assessments should be reduced after applying the appropriate ratios pursuant to chapter 123 of the Laws of 1983, as amended. Linden is claiming increased assessments for all years.
The block and lot numbers of the various tracts, all of which are located in Linden, together with the assessments, are as follows:
Block/Lot Land Improvements Total
469/38 $6,183,800 $34,341,800 $40,525,600
469/39 128,000 0 128,000
470/7 739,800 67,200 807,000
470/9 254,400 0 254,400
470/10 29,600 0 29,600
$7,326,600 $34,409,000 $41,735,600
The following schedule shows the total of the assessments of the properties at issue, together with the total values based on the application of the statutory ratio to the assessment, as well as the total values alleged by the taxpayer and Linden.
*28 year assessment ratio Tax Total C. 123 Value before Txpr’s. Linden’s average applying c. claimed claimed ratio 123 ratio value value
1983 $41,735,600 71.00% $58,782,535 $22,000,000 $132,940,000
1984 $41,735,600 67.53% $61,803,050 $24,000,000 $135,850,000
1985 $41,735,600 61.86% $67,467,830 $28,000,000 $140,075,000
The land is mostly zoned heavy industrial, with some light industrial zoning, and a very small parcel zoned residential. The residential parcel is used as a parking lot which is a legally conforming use. The land and buildings are used by taxpayer in the assembly of automobiles and have been so used for several decades with a slight interruption during World War II, when the plant was used in the assembly of military aircraft. The land area under appeal is 91.275 acres contained in three parcels. The building area totals approximately 2,400,000 square feet.
The general proposition advanced by taxpayer is that the property should be valued as a general industrial building, and, as such, compared with sales of other allegedly comparable industrial buildings. Linden’s position is that the highest and best use of the property is as an automobile assembly plant and that its construction is such that it must be valued on that basis. Taxpayer, while contending that the highest and best use of the property is general industrial, rather than as an automobile assembly plant, introduced evidence to the effect that if it was to be considered and valued as an automobile assembly plant, that the assessment was still excessive.
Linden is situated in southeastern Union County, 15 miles southwest of New York City, 5 miles south of Newark, and 38 miles northeast of Trenton. Linden is bounded on the north by Roselle and Elizabeth and on the east by the Arthur Kill (separating Union County, New Jersey from Staten Island, New York). The southern boundary of Linden includes Carteret, Woodbridge and Rahway and on the westerly boundary are *29 Cranford, Clark and Westfield. Linden has a land area of approximately 11 square miles and had an estimated population of 37,836 in 1980 and 37,474 in 1984. It is primarily an industrial city, with approximately 60% to 90% of its local property tax base being industrial. Almost 40% of its population is employed in manufacturing, with a significant percentage employed in Linden and the majority employed in Union County.
The subject facility includes most of the city block bounded by Edgar Road (U.S. Route 1) on the south, Pleasant Street on the west, Linden Avenue on the north and Stiles Street on the east, as well as minor parcels on the west side of Pleasant Street, extending from Edgar Road to the foot of Linden Street. The area is primarily industrial and highway-commercial in nature. The principal businesses in the vicinity include Linden Airport, a general aviation field to the south of the subject, across Edgar Road; Gordon’s Distillers Co. distillery and warehouse; the Tenco Coffee plant; an International Harvester dealership; and a multitenanted warehouse (previously Food Fair) to the east, fronting on Edgar Road. A Conrail switching yard and Elizabeth Avenue are north of the subject, and to the west are Merke, Sharp, and Dohme Laboratories and various commercial occupancies.
The subject property consists of a principal manufacturing facility and related buildings. Industrial utilization is compatible with current zoning and land use. Other locational factors affecting the marketability and value of industrial real estate in the area include the four-mile proximity to New Jersey Turnpike Interchange 12 on the northeast and Interchange 13 on the southwest. The New Jersey Turnpike connects with 1-95, the major highway servicing the northeastern United States, and the subject's close proximity to it is significant. The Port Authority of New York and New Jersey operates the Elizabeth Marine Terminal in Elizabeth and adjoining Port Newark, on Newark Bay. In 1981, these two ports handled over 13,000,000 long tons of freight, representing almost three-quarters of total cargo in the New Jersey/New York area. The ports are six to *30 eight miles from the subject, and the satellite industrial activities (manufacturing for export, warehousing, rail and truck shipping, etc.), that by necessity must locate near ports, create a sizable industrial base for the subject area. Conrail services plants throughout the area. A minor classification yard abuts the subject, and two spurs enter the subject site. Public utility services and a large labor base to support diversified industries are present in both the subject municipality and county.
In general, the immediate environment of the subject is a satisfactory location for industrial utilization. While there is little architectural similarity between the subject and the major improvements in the vicinity, and although the nearby commercial districts are dated by current standards, there are no significant adverse locational considerations affecting the subject.
For descriptive purposes, the land area is divided into three parcels, of which five tax lots, comprising 91.275 acres, are under appeal.
Parcel A is an “L” shaped tract, comprised of Block 469, Lots 38 and 39. This tract supports all of the building improvements, and has 1,305.84 feet of frontage on the north side of Edgar Road, 2,346.98 feet of frontage on the east side of Pleasant Street, and 1,632.86 feet of frontage on the south side of Linden Avenue. The tract has a relatively level topography at the approximate grade of the abutting streets.
Parcel Bis a parking lot at the northwest corner of Pleasant Street and Edgar Road. It is comprised of Block 470, Lots 9, 10 and 11. The tract has a level topography at street grade, and has 1,073.45 feet of frontage on the west side of Pleasant Street, 229.65 feet of frontage on the north side of Edgar Road, and 194.94 feet of frontage on the east side of Hampden Street. Lot 11 is not under appeal.
Parcel C is also a parking lot on the west side of Pleasant Street and is identified as Block 470, Lot 7. The site has 1,237.39 feet of frontage along Pleasant Street and extends to a *31 depth of 379.78 feet. The site is generally level and at street grade.
Public utilities, services and site improvements can be summarized as follows.
Sanitary Sewer. The Linden-Roselle Sewage Authority services the subject. Six outfalls from the subject carry effluent underground to authority lines. Storm Sewer. Linden municipal lines carry storm water from the subject to Marses Creek.
Water. Elizabethtown Water Company lines service the subject with a six-inch line to Edgar Road; an 8 inch line to Linden Avenue; a four-inch line to the power house from Pleasant Street; and a ten-inch sprinkler line from Linden Avenue.
Gas. A ten-inch Elizabethtown Gas Company line from Edgar Road services the subject.
Electric. Power is purchased from Public Service Electric and Gas at 26,400 volts.
Cartways. Edgar Road (U.S. Route 1) is a macadam and concrete paved roadway carrying three lanes each of eastbound and westbound traffic. Pleasant Street carries one lane each of northbound and southbound traffic on a bituminous and concrete surface. Linden Avenue carries two lanes each of northbound and southbound traffic on a bituminous and concrete surface.
Curb. Concrete curbing on all street elevations.
Sidewalks. Concrete on all street elevations.
Parking and Driveway Areas. 796,650 square feet of bituminous paved areas support 2,235 automobiles and 12 motorbikes. An additional 1,503,350 square feet of bituminous paving are utilized for product flow, shipping, receiving, rail sidings and plant traffic.
Fencing. 20,000 lineal feet of six foot and eight foot high chain link fencing.
Easements of Record. Rights of way for utility lines and rail cross Parcel A.
There are 16 buildings with a total of 2,400,000 square feet on the land. Approximately 86% or 2,077,770 square feet of the facility’s total building area is in the production building, identified as building 101. Building 101 is a one-, two-, and three-story manufacturing building and can be more fully described as follows.

Building 101 Exterior.

Foundation. Reinforced concrete wall and column footings.
Perimeter Walls. 71.51% insulated metal panels; 22.12% plastic panels; 3.89% brick and steel sash; and 2.48% granite panels.
Common Walls. Painted concrete block and suspended pressed metal panels.
Roof. Slag covered composition cover on steel deck.
Rain Conductors. Cast-iron roof drains to interior columns; supplemental PVC gutters and leaders.
*32 Truck Doors. 12 tailgate doors in enclosed dock at the southernmost portion of the east wall; 4 tailgate doors on the easternmost part of the south wall through building 102; 3 overhead steel drive-in doors supporting full size trucks; and 25 drive-in doors supporting vans and/or towmotors accessible in part through building 102 and building 103.
Rail Doors. Four spurs consisting of 1200 lineal feet of double rail and 360 lineal feet of single rail.
Pedestrian Doors. Hollow core steel and glazed aluminum units.
Windows. Industrial type fixed/projection steel sash.

Interior.

Frame. High tensile strength structural fireproofed steel columns, beams, trusses, and joists which are both the primary support for the building and hold heavy dead weight loads for the assembly process.
Column Spacing. 40 feet by 40 feet on center.
Floor Construction. Three-inch to eight-inch reinforced concrete slab on grade; three-inch and four-inch reinforced concrete slab on elevated steel deck.
Floor Cover. Exposed concrete in production areas; resilient tile and ceramic tile in lavatories, locker rooms, offices, and cafeterias.
Interior Partitioning. Painted concrete block locker room, lavatory, and office partitions.
Ceiling. Exposed structural members throughout production area; suspended acoustic tile in offices and locker rooms.
Ceiling Height The majority of the production area is 20 feet clear with actual clearance ranging from 14 feet to 32 feet.
Stairways. Masonry enclosed concrete stair towers.
Mezzanines and Balconies. 31,240 square feet of storage, lavatory, and equipment platforms.
Office Facilities. 12,470 square feet of office and related facilities in building 101; 54,130 square feet in building 102 (11,080 square feet in basement; 18,300 square feet on the first floor, and 24,750 square feet on the second floor); and 17,800 square feet in building 103.
Lavatories and Locker Rooms. Male and female installations containing a total of 411 fixtures.

Mechanical Systems.

Electrical Service. 26,400 volt primary service. Internal switchgear reduces power for plant consumption from 26,400 volts to 13,200 volts; transformers step down internal service to 480 volts.
Lighting. Joist suspended incandescent, fluorescent, and sodium vapor units.
Heating. Three 55,000 pound/hour oil-fired Erie City Iron Works boilers, installed in 1937 and rebuilt in 1970; one Combustion Engineering oil-fired 100,000 pound/hour oil-fired boiler installed in 1966. Steam is circulated throughout the plant and is used for both comfort and production.
Ventilation. Numerous roof mounted Robinson ventilators.
*33 Air Conditioning. 390 tons of total air-conditioning capacity in 60 individual units ranging from &k tons to 65 tons each.
Domestic Hot Water. Heat exchangers fed by central boilers in building 101 and building 102. Electric package units in lavatories and locker rooms throughout the plant.
Fire Protection. Joist suspended wet system in grid pattern. A 150,000-gallon ground level tank provides pressure.
Elevators. Two hydraulic-plant elevators of 20,000 lb. capacity each; one electric-plant elevator of 20,000 lb. capacity; and one office passenger/freight elevator of 6,000 lb. capacity.

Other Plant Buildings.

Fifteen accessory buildings, ranging in size from 400 square feet to 75,180 square feet, are erected on the land, these buildings is summarily described below. Each of
Bldg. Area. S»* Name. Construction.
102 Administration 67,890 SF Two-story and basement masonry building
103 Personnel 17.800 SF One- and two-story masonry and metal-clad building
104 Foam 40.800 SF One-story masonry, wood and steel building
105 Audit 32,260 SF One-story steel building
106 Paint Mix & Storage 14,400 SF One-story brick building
107 Incinerator 11,340 SF One-story brick building
108 Power House 18,100 SF One-story brick building
109 Anchor Motor Freight 14,650 SF One-story concrete-block building
110 Equipment & Conveyor 26,580 SF One-story metal-clad building
111 Stacker 75,180 SF High-bay metal-clad building for automated automobile storage of 1025 units
Flood Pump House 1,400 SF
Fire Pump House 1.000 SF
Acetylene Bldg. 1.000 SF
Primary Switch Bldg. 1,680 SF
Gate House 400 SF
*34 There are also at least nine tanks with a capacity in excess of 30,000 gallons in the complex.
Capacity Type of Location. Gallons. Container. Contents. Description.
Tank # 1 Powerhouse Tank 100,000 Steel # 6 Fuel Oil Farm
Tank #2 Powerhouse Tank 110,000 Steel # 6 Fuel Oil Farm
Tank #3 Powerhouse Tank 110,000 Steel # 6 Fuel Oil Farm
Stage 5 Second FI. West 72,000 Steel Phosphate Bldg. Addition Phosphate Solution
Phos. Dump Second FI. West 80,000 Steel Tank Bldg. Addition Empty
EIpo Process Second FI. West 55,000 Lined Steel Dip Prime Paint Tank Bldg. Addition
Elpo Dump Second FI. West 65,000 Steel Tank Bldg. Addition Empty
Water Tank Powerhouse Tank 300,000 Steel Farm Fire Water
Water Tank Northeast Warehouse of 200,000 Steel Fire Water
Since plaintiffs primary position is that the subject property should be valued as general industrial property, it must first be determined whether it should be valued as such, or whether as defendant alleges, the property should be valued as an automobile assembly plant, if that is its highest and best use.
The operation of an automobile assembly plant commences when the parts and materials, such as wheels, motors, car seats, glass, sheet metal and paint are delivered to the plant by train and truck. To produce an automobile, the frame is first assembled and welded together using over 1,000 spot welds. Doors and fenders are attached and painting occurs in various areas of the plant. Seats, upholstery, dashboards, etc., are *35 assembled to the frame. The engine/transmission, tires and gas tanks are added. Finally, inspection takes place and the automobile is completed.
The above processes are supported by the following interrelated systems:
—Electric power and control wiring systems which supply power and control electricity to the building and machinery.
—A compressed air system which supplies pressurized air throughout the plant. —An air ventilation system which supplies fresh air for the workers and which also ventilates the areas of the welding and paint spraying work cells.
—A set of storage tanks which house various liquids, some of which are funnelled into the plant through a piping system.
—A material handling conveyor system that moves the parts, materials, subassemblies and completed automobiles through the plant.
—A fire detection system to monitor, detect and activate the overhead sprinkler system.
—A water distribution, treatment and filtration system for the needs of the workers as well as various painting and welding work cells, etc.
—An extensive series of pits under several of the work cells which provide access to the automobiles for workers and equipment.
—Hundreds of openings in the roof and fan houses on the roof for ventilation and heating purposes.
—An automated storage and retrieval system building which houses 1,025 completed automobiles.
All of the above are interrelated and each is a required function in the utilization of the facility for the assembly of the automobile. The automobiles cannot be efficiently assembled if any one system is not functioning, and in almost, all cases, the plant and/or the systems would be inoperable if any of the systems were removed.
On the valuation dates at issue, i.e., October 1, 1982, October 1,1983, October 1, 1984, the plant was rated to produce 211,200 automobiles a year, or 880 automobiles a working day. This assumed 240 work days, 16 hours a day and 55 units an hour. During the years under review, it produced all the luxury model Buick Rivieras, Cadillac Eldorados and Sevilles, and the Oldsmobile Toronados, which were sold worldwide.
The main assembly building, which is the subject of primary attention for the purpose of determining the highest and best *36 use, has an attached administration building and several attached and detached auxiliary buildings. It has approximately 2,077,770 square feet of floor area, of which 25% is allocated to upper floors. The improvements were all designed and constructed in stages as parts of an automobile assembly plant during the period 1936 through 1980. The plant continued to expand through 1985, after the last valuation date. The main plant has a chronological age of approximately 32 years. However, the mechanical features of the property, such as electrical, heating, ventilating, plumbing, etc., have been continuously renovated and updated during the operation of the plant as a result of several retoolings and renovations. Accordingly, these mechanicals are predominantly of a 1960-1970 vintage.
The buildings are essentially steel-frame, concrete-metal, exterior-wall structures. The foundations consist of concrete footings, supporting posts and columns, and the superstructure consists of heavy-duty steel columns and interrelated trusses and support members. The steel superstructure is specifically designed to provide adequate weight-bearing capacity, supplementing typical “dead” and “live” loads to accommodate the automobile conveyor line process, a specification which exceeds typical manufacturing and industrial requirements. The overhead roof trusses must have specific weight-bearing capacity at the “lower core” panel points, or hanging points, in order to bear the weight of process piping, conveyor lines and associated process electrical wiring and tool rails. Throughout the main assembly plant, the loading capacity for a panel point ranges from one kip to five kips. A kip is a unit of weight equal to 1,000 pounds, which is used to express dead weight load. Hanging the various items is accomplished by attaching header steel to the roof truss and having it extend down to the item which it supports. This type structure is typically found in automobile assembly plants.
The building is configured in a general rectangular fashion, notwithstanding the additions made over the years. It maintains a shape which is advantageous for straight-line assembly plant layout consideration.
*37 The building’s story heights are varied. On the first floor they average 25 feet. The second floor, which primarily houses the paint shop and some small trim assembly functions, has a story height of 15 feet.
The bay sizes on the main floor are 40 feet by 40 feet between the columns, and there are approximately 1,200 total bays in the main assembly plant.
In addition to the automobile assembly area, there are: a tire room, of masonry construction, with a roof specifically designed to withstand an explosion; a fireproof foam room; vending machine areas; a partitioned-off cafeteria, as well as numerous platforms, catwalks, bumper rails and office modules located throughout the plant. There are railroad drawbridges and a finished battery charge area, which is serviced with special electricity and ventilation to permit the recharging of batteries for the forklifts. A drop ceiling in the paintshop conceals the overhead trusses.
Loading and unloading facilities are extensive. There are three railroad access doors, accommodating four separate railroad lines with supporting docks. These are advantageous in utilization of the “just in time” type of industrial manufacture or assembly. The rail lines accommodate a total of 58 boxcars and are strategically located to service specific assembly functions. There are also 17 truck loading docks with approximately 40 doors. They are strategically located around the perimeter of the plant, with the main receiving area being in the southwesterly corner of the plant. The plant currently operates on a “just in time” material handling basis, with the capacity to unload 130 trucks daily.
The plumbing systems include a potable water supply and sanitary and sewer piping. There are miles of piping from several water processing systems, a body shop closed loop welder water-distribution system, an automobile fluid filled *38 piping system, a steam-condensate pumping system and a compressed-air system serving the assembly lines.
Process water systems are utilized within the plant for various functions relating to the assembly, painting and finishing of the automobiles. Car bodies require a water rinse as well as a deionized water rinse in connection with the “body bonderite” painting process. There are also several water test booths built into the plant, since water is utilized for wet sanding of the car bodies as part of the painting process. The wet-sand water system utilizes temperate water of 90 degrees Fahrenheit.
A process-water system also services the paint booths and it is utilized to cleanse the air being forced through the paint booths. Process water (deionized) is also utilized for humidification of the air in the paint booths. It is utilized to clean the paint-laden air and is supported by a paint booth central sludge treatment system which contains numerous tanks, including a very large equalization tank, along with the other supporting systems.
Process fluids, stored in 11 different tanks, include gasoline, thinner, retarder, antifreeze, rear-axle lubricants, diesel fuel, transmission fluid, freon and power-steering fluid. These process fluids are funneled into the plant through piping systems. The tank farms are surrounded by retaining walls for the purpose of spill containment.
A compressed air system services the entire facility and is powered by six air compressors with various capacities. Three are steam powered and three are electric powered. They are supported by two compressed air chillers, 75 horsepower each, and two cooling towers. This compressed-air system is utilized in the painting process, the welding process and throughout the plant.
There is also a steam and condensate piping system used to distribute steam throughout the plant, including steam for the makeup air units. It is also used to service the perimeter heaters and the zinc-phosphate systems utilized in the paint *39 shop. The steam-distribution lines are extensive throughout the plant.
The plant is entirely sprinklered and has an elaborate fire detection system.
The plant and related processes have an extensive ventilating and air-conditioning system. This is serviced by a central, oil-fired, steam-generating boiler system. High pressure steam is produced, utilizing # 6 fuel oil, in the power house which contains four separate boilers. There are three 55,000-pound-per-hour boilers and one 80,000-pound-per-hour boiler, indicating a total capacity of 245,000 pounds per hour. These boilers were rebuilt in the 1970’s.
In addition to steam heating used for comfort, the plant has an extensive system of rooftop mounted makeup air units. Each is rated at approximately 30,000 cubic feet per minute, servicing approximately 800,000 square feet of the main assembly plant. These rooftop mounted air-handling units bring in outside air, assisting in the movement of air for ventilation and, if required, tempering the air to designated inside temperatures. They are not designed to heat the property for comfort purposes. Their purpose is to provide makeup air systems so that fresh air pours into the plant in sufficient quantity to offset the detrimental effects of the assembly process, such as welding, testing of engines and painting.
There are approximately 50 large makeup air houses on the roof of the structure. Each house is a structure unto itself and measures 10 feet by 10 feet by 20 feet. The structures are roof-mounted sheet-metal buildings with waterproof tops. The most extensive aspects of the makeup system are the components of the paint booths. The capacity of those particular units can equal the capacity of the units for the rest of the plant. Some of these units utilize steam and others utilize gas for heating. Installed on the roof of the facility over the paint-booth area, they involve a large amount of duct work. Supplementing the rooftop mounted makeup air units in the paint shop áre numerous stacks which are utilized to exhaust the paint *40 booths and ovens. In addition, there is “spot ventilation” throughout the plant. These can be utilized at various parts of the plant and particularly in the workpit area where personnel work in the assembly or inspection process.
The large capacity boiler system produces the necessary volume for the production process in painting and other uses.
The electrical system in the plant is extensive. It was described by one of plaintiffs witnesses as “more powerful than any other he had ever inspected, other than in other automobile assembly plants.” High tension service of 26,400 volts is transformed by two 15 MVA transformers for transfer to substations, and such voltage is then transmitted via bus ducts throughout the plant. The plant is serviced by heavy-duty power wiring for welding, power paneling and auxiliary battery-powered emergency lighting packs. Throughout the plant there are various basement and workpit areas under the assembly line to permit workers to assemble and inspect the underparts of the automobiles being produced.
The paintbooths and ovens are permanently affixed rooms or structures assembled within the plant. They are extensively filtered, heated, lighted, and otherwise environmentally controlled. They are connected to the various utilities servicing the plant, such as the air system which drives the paint-spraying equipment and the paint-delivery system connected to the paint booths. They are also connected with the process-water system and the sludge system. The spray booths utilize a water-base evaporative cooling system designed to bring humidity up as part of the painting process. They are also, as previously noted, connected to the rooftop-mounted makeup air houses. During the years involved, the main plant had six paint booths. Two additional booths were in the final repair area. The paint ovens are also internal rooms, permanently installed in the structure and connected to the utility systems. They serve to bake the paint onto the car after it has been applied. There were 14 separate ovens in place during the years involved. These ovens are very large and have several *41 temperature zones with associated heaters generating over 1,000,000 BTU’s. Serviced by a separate natural-gas system, they are connected to a venting system which exhausts the air with the volatile compounds and brings in fresh air.
The main conveyor system in place consisted of header and hanger steel, bolted, clamped, or welded to the steel superstructure and from which hung the conveyor rail. This permitted conveyance of units or unit parts throughout the main assembly plants. There are various types of conveyor systems, some overhead and some on single tracks bolted to the floor. Others, called flattops, are installed into the floor.
The most recent retooling and renovations, as of the value dates at issue, were done in March 1977, at a cost of $17,700,-000, and March 1979, at a cost of $39,100,000. In 1985, subsequent to the valuation dates here involved, an addition to the building was constructed, known as the “West Side Addition,” to accommodate the 1985-1986 retooling. This renovation was implemented pursuant to a decision which General Motors made in 1983 to designate the Linden plant as the one to assemble the 1987 General Motors “25 car.” Those models, known as the Beretta and the Corsica, were expected to reinstate Chevrolet’s position as leader in the compact group of the passenger-car market. At that time, the Japanese were increasing their American market share for this size automobile. The General Motors appropriation request for renovation of the body shop, paint shop and trim shop approximated $193,000,000.
Taking all specific aspects of the subject plant into consideration, it is obvious that it is ineluctably devoted to the assembly of automobiles. All elements of that assembly process are in place, and the complete structure is geared toward having those elements work efficiently. In reviewing the case of Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153 (1988), aff’d—NJ.Tax-(App.Div.1990), certif. granted —N.J.—— (1991), the description of the Ford plant has striking similarities. While the subject plant is substantially larger, with a higher car production capacity, the improvements within *42 the plant are almost identical. In that case, it was found that the highest and best use of the property was as an automobile assembly plant, and not as a general manufacturing facility. The facts in this case lead to the same conclusion. The facility has been built, fitted and operated for the assembly of automobiles. The nature of the various special features contained in construction of the plant have been detailed. The inevitable conclusion is that its highest and best use is as an automobile assembly plant.
The same attributes incorporated in the structural aspects of the subject assembly plant also require a finding that it is a special purpose or special design property. In this respect, see American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987), which describes such properties as follows:
Many market properties include structures with unique physical designs, special construction materials, or layouts that restrict their utility to the use for which they were originally built. These properties usually have limited conversion potential and, consequently, are often called special purpose or special design properties. Examples of such properties include houses of worship, museums, schools, public buildings and clubhouses, [at 21]
Where the property’s basic construction is for its current special use, it is considered special purpose property. In New Jersey, such special purpose properties have a market in its present occupancy and ownership when the property is being used for the purpose for which it is designed. That principle was stated succinctly in CPC Int’l., Inc. v. Bor. of Englewood Cliffs, 193 N.J.Super. 261, 473 A.2d 548 (App.Div.1984), where the court reviewed the valuation of a taxpayer’s international corporate headquarters. In rejecting a functional obsolescence allowance for additions which were installed to enhance the prestige of the headquarters office, which the Tax Court found were not such as to increase the property’s resale value, the court stated that such adjustment overlooked two governing principles in the valuation of property for local property tax purposes. It there stated:
... The first is that the sale contemplated as the criterion of market value is a “hypothetical sale; hence, the would-be buyers are hypothetical buyers, not *43 actual and existing purchasers.” United New Jersey, etc., Co. v. State Board etc., 100 N.J.L. 131, 135 [125 A. 335] (E. & A.1924). From the context in which it was made we can only understand this reference to a hypothetical buyer to contemplate one whose requirements are reasonably accommodated by the property in question.
The second governing proposition bears on the intent and purpose of the taxpayer. Its substance is that no reduction from taxable value will be allowed for special purpose characteristics where these were built into the structure by the taxpayer without regard to the recoverability of their costs and the question of their marketable value is not raised by any realistic suggestion that the property is about to be offered for sale, [at 268-269, 473 A.2d 548]
Those principles were specifically utilized and recognized in Westinghouse Elec. Corp. v. Bloomfield Tp., 9 N.J.Tax 92 (Tax Ct.1985), aff’d 9 N.J.Tax 108 (App.Div.1986). See also Brockway Glass Co. v. Freehold Tp., 10 N.J.Tax 356 (Tax Ct.1989), aff’d —-N.J.Tax-(App.Div.1991), where a glass manufacturing plant was valued as at its highest and best use, rather than as a general manufacturing plant.
Since the subject property is a special purpose or special design structure, presently in its highest and best use by its owner, it cannot be valued by comparison with general manufacturing facilities which do not contain the same attributes.
Plaintiffs expert, Coyle, premised his valuation on the basis that this property would be sold or leased only as a general manufacturing facility. His value estimate is therefore inherently erroneous. His cost approach, other than land, is of little help in determining value, since his cost value was that of a general manufacturing facility. Accordingly, it is unnecessary to consider his testimony, except with relationship to land value.
Recognizing the probability that the subject property would be valued as a special purpose automobile assembly plant, plaintiff introduced testimony utilizing the cost approach to determine its value as such.
Plaintiff first presented a witness from an engineering firm, SSOE, who testified that a modern automobile assembly plant, *44 which would produce 55 cars an hour, would be a one-story building. As he presented in model form, such building, producing 55 cars an hour, had the same capacity attributed to the subject. He also testified, based on that model, as to items of claimed functional obsolescence which were present in the subject property. He pointed out those alleged deficiencies as compared with the model plant. Plaintiff then introduced the testimony of a real estate appraiser who placed a cost to reproduce the improvements as presently existing and also placed a construction cost on the model plant which had been the product of SSOE. It was by using the model plant to conclude cost and functional obsolescence that plaintiff placed its replacement value on the improvements under review.
Prior to analyzing the quality of such evidence for the purposes of this case, plaintiffs legal argument is that the fitups included in the subject assembly plant, which have been described in detail, are not subject to local property tax. It is alleged that: (1) they were not included on the property record card, and as such, had to be put on as added assessments for which the time had passed, and (2) in any event, they were personal property and not subject to local property tax.
In support of the proposition that the added assessment procedure must be utilized by the assessor in order to include the value of the fitups in the assessment, plaintiff mistakenly relies upon the case of Chevron, U.S.A., Inc. v. Perth Amboy, 9 N.J.Tax 571 (Tax Ct.1988). That case involved the question of whether the municipality could seek an increased assessment by virtue of an addition which had been placed on the property prior to the assessment date at issue. Judge Andrew there stated that there was nothing in the added-assessment provisions which required an assessor to affirmatively move to increase the assessment of properties which had been improved, particularly where the improvements had all been there on the assessment date. Here, too, the issue is what was in place as of the assessment date. There is here a question of whether the total structure, including the fitups, had values which support the assessments or which would result in an increase in *45 the assessments in accordance with defendant’s position. There is no omitted assessment here involved since that procedure provides for the taxation of property which, through error, has been omitted from assessment. See Chevron, U.S.A., Inc. v. Perth Amboy, supra at 577. Here, there is nothing to indicate that the fitups were omitted from the assessment. The only issue is the value that can be attributed to a building of which those fitups were an integral part.
Plaintiff also claims that the fitups are personal property because they are not integrated into the property pursuant to the provisions of N.J.S.A. 54:4-1, as amended by L.1986, c. 117, § 1, which, in relevant part, provides:
Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto, unless:
a. (1) The personal property so affixed can be removed or severed without material injury to the real property;
(2) The personal property so affixed can be removed or severed without material injury to the personal property itself; and
(3) The personal property so affixed is not ordinarily intended to be affixed permanently to real property; or
b. The personal property so affixed is machinery, apparatus, or equipment which is neither functionally essential to a structure the personal property is within or to which the personal property is affixed nor constitutes a structure itself.
Also, as amended by c. 117, N.J.S.A. 54:llA-2 states:
(b) “Personal property used in business” shall mean tangible goods and chattels used or held for use in any business, transaction, activity or occupation conducted for profit, but shall not include:
(2) goods and chattels which are taxable as real property pursuant to N.J.S.A. 54:4-1.
The above statute, together with the regulations applicable thereto, was discussed in Texas Eastern v. Division of Taxation, 11 N.J.Tax 198 (Tax Ct.1990). It was there held that compressors, regulators, piping and tanks used by the taxpayer for the purpose of compressing and moving gas through the pipeline and metering and regulating the amount of gas sold to customers, constituted taxable real property. In so holding, the *46 court reviewed the history of the legislation. N.J.S.A. 54:4-l(a) clearly recognizes that all improvements to the land, including personal property affixed to the real property, or an appurtenance thereto, is taxable as real estate unless certain features apply. There is no doubt that the fitups included in the value of the assembly plant could not be severed or removed without material injury to the fitups, and they were obviously intended to be affixed permanently to such real property. Further, Subsection b, upon which plaintiff relies, exempts machinery, apparatus and equipment which is not functionally essential to the structure containing the personal property, or to which the personal property is affixed, or constitutes a structure itself. In construing Subsection b, the Texas Eastern court stated:
... That which would be regarded as machinery, apparatus or equipment and not taxed as real property if contained in a general purpose property is taxed as real property when affixed to special purpose property because it is functionally essential to the “special purpose.” Thus, items such as gauges and electrical control systems that would be regarded as personal property when used in the operation of the machinery, apparatus or equipment are to be taxed as real property when functionally essential to the purpose of special purpose property. [11 N.J.Tax at 211]
Having concluded that the fitups, even if they could be defined as personal property, are integrated and functionally essential to the subject automobile assembly plant, they are properly included in its value for local property tax purposes.
Since plaintiff’s model assembly plant failed to include those fitups which were essential to it being an assembly plant, it omitted the basic components of this special purpose building. What it proposed for valuation was a shelter for the real functions of the facility. While a general purpose structure may be beneficial in determining some of the internal functional obsolescence of the subject, it cannot, in and of itself, be the basis for full value without considering the fitups or integrated mechanical apparatus.
In addition to the failure to include fitups in the value of the theoretical replacement facility, there were several other questionable changes in theorizing a replacement model. Among those were the failure to have any interior rail spurs in the *47 structure. Such rail spurs were standard items which plaintiff consistently utilized in assembly plant construction. SSOE, the engineering firm which detailed the model plant, had never built a plant for plaintiff. However, the testimony presented was that its ideas were superior to plaintiff’s. As will be noted, infra, plaintiff was planning, constructing, or had constructed assembly plants during this period. All had interior rail spurs.
Another contentious point was the SSOE expert’s testimony that centralized steam boilers were obsolete, and that the idea of standard gas-fired units was superior. However, defendant produced a report to the contrary, prepared by plaintiff’s own experts. That report recognized the functional utility of subsequent cogeneration of electrical energy through large steam boilers. Also, the sole reliance on a single fuel source was something which plaintiff avoided. In the subject plant, the # 6 oil-fired boilers could be converted to gas fuel with relative ease.
There is a presumption of correctness of a local property tax assessment. The effect of this presumption was detailed in Transcontinental Gas v. Bernards Tp., 111 N.J. 507, 517, 545 A.2d 746 (1988), as follows:
Taxpayers, in challenging the municipality’s original assessment, bear the burden of rebutting the validity of the quantum of this assessment. Riverview Gardens v. Borough of North Arlington, 9 N.J. 167, 175 [87 A.2d 425] (1952). As we observed in Pantasote Co. v. City of Passaic, 100 N.J. 408 [495 A.2d 1308] (1985), this presumption is not simply an evidentiary mechanism allocating the burden of proof, but “a construct that expresses the view that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with the law.” Id. at 413 [495 A.2d 1308]. In Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99 [89 A.2d 385] (1952), the Court announced what has come to be accepted as the definitive verbal formulation of the burden imposed on a taxpayer challenging an ad valorem property tax assessment: “it is not sufficient for the taxpayer merely to introduce evidence: the presumption stands until sufficient competent evidence is adduced to provide a true valuation different from the assessment. Such evidence must be definite, positive, and certain in quality and quantity to overcome the presumption.” Id. at 105 [89 A.2d 385], In Pantasote we interpreted this to mean that the presumption remained in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or *48 the method of assessment itself is so patently defective as to justify removal of the presumption of validity. Pantasote, supra, 100 N.J. at 415 [495 A.2d 1308].
The evidence presented by the plaintiff fails to meet the test of sufficient competence to overcome the presumptive correctness of the assessments. In substance, the testimony of Coyle was directed toward a general purpose building, not an automobile assembly plant. The testimony of SSOE and the exhibits were directed toward SSOE’s version of the shell of a modern automobile assembly plant and a version of construction at odds with plaintiff’s own philosophy. That testimony must fail since SSOE, while a competent engineering group, was not an automobile manufacturer. Plaintiff is. Its production during the years involved exceeded all other manufacturers in the United States and Canada. Plaintiff’s plants being built during this period were similar to the subject. Further, the so-called model plant was basically a shell or a general manufacturing facility which assertedly could house an automobile assembly plant. That is what plaintiff’s valuation expert, Rinaldi, valued in his testimony. Plaintiff’s case fails to reach the required level of being definite, positive and certain in quality, to overcome the presumptive correctness of the assessments applicable to the subject automobile assembly plant.
Here, defendant seeks increased assessments. It relies on the testimony of its appraiser, Chaiken, as well as the actual costs incurred by plaintiff in building automobile assembly plants during this period of time.
Chaiken’s cost approach involved several steps. He first valued the land. He then placed reproduction or replacement values on the main building, administration building, personnel building and ancillary buildings. In doing this, he relied upon the Marshall & Swift segregated cost indices. Initially, he did not include entrepreneurial overhead and profit. The preliminary value for the main building was as a general purpose “speculative” construction. He next valued the main building using the construction costs actually incurred by plaintiff in the construction of various assembly plants between 1977 and 1986. Included in these costs were the special fitups which represent *49 ed the difference between a general purpose structure and an automobile assembly structure.
Chaiken had personally inspected the subject plant prior to its renovation in 1985. He had also inspected plaintiff’s assembly plants at Wentzville, Orion, Detroit and Shreveport. He had been advised that the assembly plant in Fairfax was a virtual duplicate of the Orion and Detroit plants. All those plants had been constructed between 1979 and 1987. An assembly plant generally takes from three to five years to build. Using detailed information obtained from plaintiff, he reviewed the overall fitup construction costs of those plants. He took those costs and adjusted them for the construction-cost differential between their locations and Linden to get an adjusted cost to construct the main building of an automobile assembly plant on a square-foot basis in Linden. This was reduced by 10% to reflect his judgment of the excess cost of a one-story construction, as opposed to the one-, two- and three-story construction of the subject main building. He then adjusted these costs for time to bring the main-building values to the pertinent assessment dates. His costs for the other improvements were based on the Marshall Valuation Service and not adjusted by reference to plaintiff’s other construction costs. By including the adjusted cost of the fitups to the main building, he concluded that its cost, as of October 1,1982, was increased from $67,863,-201 to $126,958,704. When the values for the ancillary buildings, as derived from the Marshall Valuation Service, were added, the plant was considered to have a replacement cost of $141,746,000, or $59.14 a square foot, before soft costs and entrepreneurial profit.
To put the above reproduction cost in perspective, it must be noted that when plaintiff effected extensive renovation of the subject plant in 1985 to meet the competition of Japanese compact cars, it expended $232,914,000. This included 85,600 square feet of new area, at a cost of $7,504,000, or $87.66 a square foot. The total cost did include a number of renovations to the standing structure, including the effective remodeling or replacement of the paint spray booths and ovens. The costs for *50 remodeling and expanding the painting section alone amounted to $103,575,000.
Chaiken’s computed square foot value is to be compared with the actual costs of construction of plaintiff’s five plants constructed during this period, as shown on the following schedule.
Indicated Unit Costs, Linden Plant (MVS) a/o 10/82 for TY 1983:
Basic Industrial Building(s): $34.48/SF
Automotive Assembly Plant: $ 59.14/SF
compared to actual experiences, (adjusted to Linden, New Jersey):
WENTZVILLE:
Basic Industrial Building(s): $44.39/SF
Automotive Assembly Plant: $ 96.23/SF
ORION:
Basic Industrial Building(s): $36.78/SF
Automotive Assembly Plant: $ 84.08/SF
DETROIT:
Basic Industrial Building(s): $43.57/SF
Automotive Assembly Plant: $100.28/SF
SHREVEPORT:
Basic Industrial Building(s): $41.86/SF
Automotive Assembly Plant: $ 94.78/SF
FAIRFAX:
Basic Industrial Building(s): $40.63/SF
Automotive Assembly Plant: $87.63/SF
AVERAGES (5 actual facilities): $41.45/SF
$92.60/SF
As can be seen from the above, Chaiken’s $59.14 a square foot cost, when compared with the average of $92.60 for the new construction of plaintiff’s other plants, is a conservative cost figure.
In determining the value attributable to soft costs or, as he refers to it, “entrepreneurial overhead,” he included contingen *51 cies. Based upon his experience, he believed that in a construction period of two or more years, there would be unforeseen changes and modifications in plans, as well as cost overruns. To absorb the cost of these, he allowed 5% for unforeseen contingencies. He next included real estate taxes during construction, again taking a two-year period. This was considered a soft-cost expense of at least $160,000 a year for the property involved. Further, there would be partial tax assessments on the improvements as construction progressed. He concluded that property taxes, based upon the assessed value of the land, as will be discussed infra, would be at least $320,000 and that the partial assessments during construction would amount to $1,500,000. He considered the return on the land investment which, if purchased with a general credit mortgage, would be an interest cost. He concluded that the land value should produce an amount equal to 8% a year, which should be added to the cost. He also recognized the need for the entrepreneur-investor to monitor, oversee and review the efforts of the architect and contractors as well as the legal, accounting and financial service costs over the two-year construction period. For these he added $675,000. Adding the soft-costs total to a 5% factor for the contingencies and a 5% entrepreneurial profit, he concluded that the additional costs for the October 1, 1982 assessment value would be $16,500,000. This approximates 11.64% of the basic construction cost on that date. He thus concluded that $158,246,000, or $66.02 a square foot, was the cost of replacing the subject automobile assembly plant.
The use of soft costs and entrepreneurial profit is an accepted procedure in placing a value on property through the cost approach. That procedure was discussed, in detail, in the recent case of Beneficial v. Peapack & Gladstone Bor., 11 N.J.Tax 359 (Tax Ct.1990), wherein the court stated:
I add a conservative 10% of the direct and soft costs for entrepreneurial profit. Entrepreneurial profit is justified ... even for an owner-constructed and owner-occupied building because the principle of uniformity requires such property to be treated in the same manner as investment or speculation type property. See McGinley Mills v. Town of Phillipsburg, 9 N.J.Tax 508, 517 (Tax Ct.1988) (“[I]t is necessary to include a figure which reflects the time, *52 effort and incidental expense of the owner in the development of the property”); Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481, 535 (Tax Ct.1983) (realistic cost approach must recognize adequate compensation to the entrepreneur to induce him to organize the project); American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 360 (“Entrepreneurial profit is a necessary element of cost because it motivates developers to construct improvements.”) Although the subject property may not have been built for sale, it actually was sold, and there was a substantial profit to Beneficial, [at 381]
When a building is constructed by an entrepreneur, in anticipation of sale and corresponding profit, profit is obtained through the use of that building as a sale item. When the building is constructed by the owner for use in his business, he still acquires a value in addition to actual cost, even though the building was not built for sale.
In computing the soft costs and entrepreneurial profit, Chaiken’s amounts approximated 11.5% for each of the years. The most appropriate addition is 10% because of both the magnitude of the project and since two contingency factors of 5% were included in Chaiken’s figure. Accordingly, costs new, including soft costs and entrepreneurial profit, amount to $155,-920,600 as of October 1, 1982.
In computing depreciation, Chaiken used a weighted actual or chronological age for all the improvements, to arrive at a 30-year weighted age. Using the Marshall & Swift table of recommended life expectancies of buildings by types of occupancy and class of construction, he concluded that the average manufacturing industrial building, in the A class, had a typical life expectancy of 50 years. The resulting depreciation would be 34%. This table gives a remainder value to property, rather than depreciating it to nothing. However, he considered the effective age of the subject property to be 27 years because of the frequent renovations and additions, as well as the maintenance of the structure by GM. He then concluded that with an effective age of 27 years and a life expectancy of 55 years, the total accrued physical depreciation for 1983 was 21%. While it is recognized that the building was being fully maintained on a perpetual program, such limited depreciation failed *53 to consider the fact that the mechanicals or fitups had a more limited life than the overall structure. The frequent changes in the building for various assembly purposes support that conclusion. It is also corroborated by the fact that it was substantially renovated in 1985, as discussed, supra. Rather than treat the whole building as having an effective age of 27 years, a recognition of the more limited life expectancy of the fitups and mechanicals should be considered. Approximately 38% of the value of the plant was in that specialized construction. Accordingly, the non-fitup portion of the building, or approximately 62%, will have a typical life of 50 years and a 30-year effective age.
Construction of the new automobiles in 1985 mandated substantial changes and corroborates a need for a faster rate of depreciation for that portion of the building which was being modified. While all the mechanicals and fitups were not changed or modified, a substantial quantity were. Depreciation should reflect that more limited functional life. Accordingly, the mechanicals and fitups which represent 38% of the overall cost of the plant are ascribed a typical life expectancy of 20 years and an effective age of 14 years, as of October 1, 1982. Using the Marshall & Swift valuation table, the depreciation of the fitups is 60%. The above allocation of depreciation produces a depreciated value of $87,502,641, before considering obsolescence.
The above revision of the depreciation rates is justified by the facts and the duty of this court to arrive at a true value. See Glen Wall Assoc. v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985), where it was stated:
The Tax Court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question. [New Cumberland Corp. v. Roselle, 3 N.J.Tax 345, 353 (1981)]
All experts recognized the obsolescence of the monitor roof and the block flooring in the main building. In reaching his conclusion for all the years, Chaiken reduced the depreciated value by $2,000,000 for roof obsolescence and by $1,500,000, as *54 the cost to either replace or maintain the wood flooring during the life of the building. The slight elevation difference in the different sections of the main building and the third floor is offset by the cost of additional acreage needed to build a single story plant. Further, the 40' by 40' bays do not substantially deviate from current standards of construction as to require a meaningful adjustment.
The monitor roof, with glass paneling which lets in light, is not used on factories today. Its maintenance disadvantages were reflected in the reduction of value attributed by Chaiken. Such roofs, however, do have the advantage of providing ventilation since the windows do open. Chaiken’s adjustment was appropriate. Further, the block flooring was still, in part, left in use after the renovation in 1985. Chaiken’s computation of the functional obsolescence attributable to the floors is also accepted.
The various items which Rinaldi had determined to be internal functional obsolescence based on his computations of greater efficiency in the workforce are not accepted. He was not qualified to give, nor do the facts support, a time and motion study to corroborate his adjustments.
The external obsolescence claimed by Rinaldi and testified to by another of plaintiff’s witnesses was based upon their beliefs that the automobile industry was in dire straits and that New Jersey was one of the most undesirable places to have an automobile assembly plant located. I find that production of automobiles at the subject plant was consistently up to or over its scheduled capacity during all the years involved. The automobiles assembled there were high quality automobiles and not subject to competition by smaller foreign cars as were domestic compact cars. The testimony that New Jersey was not a desirable place to locate an automobile assembly plant is not accepted. The Linden area provided a quality workforce which the Linden plant enjoyed. Further, the eastern United States, in which the plant is located, is the area that is most densely populated and is consequently a major market for automobiles. *55 Statements that areas of the United States to the west of New Jersey were superior fail to reflect the transportation convenience of Linden and its workforce.
External obsolescence may be justified by an analysis of the net operating income of the structure. See Reilly, “Identification and Quantification of Economic Obsolescence,” 1 Property Tax.J. 45 (1988). The profitability of the subject plant had been audited annually by plaintiff as part of its evaluation of plant facilities. The operating profits attributed to the subject for the years 1979 through 1983 were as follow:
1979: $ 52,517,532
1980: $ 63,805,765
1981: $ 93,657,136
1982: $ 69,926,604
1983: $131,703,776
The above profitability fails to support any economic obsolescence.
The suggestion that the proposed use of the Linden plant to manufacture compact cars to compete with Japanese imports was merely because the Linden plant was available is not persuasive. The record reflects that plaintiff had plans on the drawing boards for the automobiles which it proposed to produce, in many cases, years before the plants in which they were to be assembled were constructed. The Linden plant was available because plaintiff was transferring operations formerly performed in Linden to its new Michigan plant. Plaintiff also had entered into a joint venture with Toyota to assemble compact cars at a jointly-owned plant on the west coast. The subject was thus conveniently located on the east coast. The foregoing, including the positive features of location near major highways, seaports and railroads, demonstrate that the plant does not suffer from any external functional obsolescence.
Chaiken’s reproduction cost of $59.14 a square foot as of October 1, 1982 is accepted. Also accepted is the percentage increase of 3.97% a year for construction costs which he developed from his analyses of the Marshall & Swift cost indices for *56 general purpose industrial facilities in Linden. The following schedule, which utilizes those construction costs as adjusted, reflects the cost approach values of the improvements as of the assessment dates.
Reproduction Cost Value
October 1, 1982.
Reproduction cost: $141,746,000
Entrepreneurial profit and overhead: 14,174,600
Cost new: $155,920,600
Depreciation:
Plant less fitups: 62% x 34% x $155,920,600 = ($32,868,062)
Fitups: 38% x 60% X $155,920,600 = ($35,549,897)
Depreciated cost value: $87,502,641
Functional obsolescence: (3,500,000)
Improvement value: $84,002,641
October 1, 1983.
Cost new: $155,920,600 X 1.0397 $162,110,648
Depreciation:
Plant less fitups: 62% X 36% X $162,110,648 ($36,183,097)
Fitups: 38% X 65% X $162,110,648 ($40,041,330)
Depreciated cost value: $85,886,221
Functional obsolescence: (3,500,000)
Improvement value: $82,386,221
October 1, 1984,
Cost new: $162,110,648 X 1.0397 $168,546,441
Depreciation:
Plant less fitups: 62% X 38% X $168,546,441 ($39,709,541)
Fitups: 38% X 69% X $168,546,441 ($44,192,877)
Depreciated cost value: $84,644,023
Functional obsolescence: (3,500,000)
Improvement value: $81,144,023
Chaiken also used a comparable sales approach to value the subject. However, the method followed was basically ascertaining the market value of an existing general manufac *57 turing structure and then using the cost approach to convert it into an automobile assembly plant. This hybrid approach fails to recognize that the many variables which go into the comparability approach are only compounded by the additional cost approach procedure. Such approach is not considered appropriate.
In valuing the land, plaintiff used the testimony of Coyle to conclude a value of $97,519 an acre, as of October 1, 1982. Chaiken concluded a value of $125,000 an acre, as of the same date. There was one basic difference in their approaches. Coyle concluded that since he was valuing a large tract of land, there should be a discount for the size of the property. Chaiken felt that the size of the land was a positive factor, in that it permitted the highest and best use of the property. Coyle gave various negative size adjustments to his comparable sales, going from a negative 5% for the 23 acre tract to 25% for smaller seven and four-acre tracts.
Chaiken gave a 10% premium to the values which he had concluded from the four transactions which he used as his base. Eliminating the negative size adjustments from Coyle’s comparable sales and utilizing a higher negative impact of the nonindustrial zoning in the rural Franklin Township sale, produces a range of values from $97,000 an acre to $125,000 an acre. Further reviewing Chaiken’s transactions, if the 10% positive adjustment which he gave as a premium for the large size of the lot was deducted from his estimated value, the value would approximate $112,500 an acre. This value fits within the range of the adjusted comparable prices of Coyle.
Accordingly, the land will be valued at $112,500 an acre, as of October 1, 1982. Chaiken used a time value increase of 10% a year to conclude values as of October 1, 1983 and October 1, 1984. Coyle, however, used a land appreciation of 3-V2%, as of October 1, 1983 and an additional 6.6%, as of October 1, 1984. The valuation report of Coyle gives comparable sales in Linden during 1984 at $65,042 and $72,500 an acre, respectively. He brought these prices up to $103,462 an acre, and $107,300 an *58 acre, as of October 1, 1984. There, too, his adjustments included a 10% negative adjustment as to sale # 5, based on the size of the subject and a 20% negative adjustment as to sale # 6, based on the size of the subject. Chaiken’s 10% annual approximation is fully corroborated by the purchase by plaintiff of adjoining land, on March 20, 1985. This parcel contained a warehouse and an abandoned distillery, and after computing a replacement value for the warehouse, the result was approximately $285,000 an acre for the land. Taking the above into consideration, I find that the land values of the subject increased at 10% a year and that such adjusted value will be used in the cost approach for the other years at issue.
Applying the principles previously detailed, the cost approach is the most appropriate way to value the subject. Those values are as follow:
Year Improvements Land Total
10/1/82 $84,002,641 $10,268,438 $94,271,079
10/1/83 82,386,221 11,295,281 93,681,502
10/1/84 81,144,023 12,424,809 93,568,832
Chapter 123 of the Laws of 1983, as amended, precludes adjustments to an assessment if it falls within a 15% protective range of the statutory common level ratio as published by the Division of Taxation. The ranges, including the statutory common levels, were as follow:
Year Lower Limit % Average Ratio % Upper Limit %
IM 6Ü7JÜ 7LÜS 82.00
1984 57.40 67.53 77.66
1985 52.58 61.86 71.14
The ratios of the assessment to value are as follows:
Year Assessment Value Ratio
ISSJ $41,735,600 $942717)79 4427%
1984 $41,735,600 $93,681,502 44.55%
1985 $41,735,600 $93,568,832 44.60%
*59 Since the assessment-market value percentage for each year is lower than the protective assessment range, the assessments may be increased. The new assessments are based upon an application of the above average ratio to the market value for each year. Such application produces the following assessed values:
Assessment date Assessment (rounded)
October 1, 1982 $66,932,500
October 1, 1983 $63,263,100
October 1, 1984 $57,881,700
The adjusted assessments will be allocated among the lots by using the market value of the land, adjusted by the chapter 123 ratio, for land assessments. The improvement assessments will be based on the ratio of the present assessments to the remaining assessment values.
The Clerk of the Tax Court will enter a judgment revising the assessments as follows:
Assessment date: October 1, 1982.
Block/Lot Land Improvements Total
469/38 $6,174,100 $59,528,500 $65,702,600
469/39 94,300 94,300
470/7 738,600 113,400 852.000
470/9 254,000 254.000
470/10 29,600 29,600
$7,290,600 $59,641,900 $66,932,500
Assessment date: October 1, 1983.
Block/Lot Land Improvements Total
469/38 $6,459,600 $55,529,700 $61,989,300
469/39 98,700 98,700
470/7 772,800 105,700 878,500
470/9 265,700 265,700
470/10 30,900 30,900
$7,627,700 $55,635,400 $63,263,100
*60 Assessment date: October 1, 1984.
Block/Lot Land Improvements Total
469/38 $6^ÜP00 $50,100,300 $56^097200
469/39 99,400 99,400
470/7 778,700 95,400 874,100
470/9 267,800 267,800
470/10 31,200 31,200
$7,686,000 $50,195,700 $57,881,700