604 A.2d 580

FORD MOTOR COMPANY, PLAINTIFF–APPELLANT,
v. TOWNSHIP OF EDISON, DEFENDANT–
RESPONDENT.

Argued September 24, 1991—Decided April 7, 1992.

292

*Richard L. Plotkin* argued the cause for appellant (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Richard L. Plotkin, Betsy W. Bresnick,* and *Christopher J. Stracco,* on the briefs).

*Anthony D. Andora* argued the cause for respondent (*Andora, Palmisano & Geaney,* attorneys; *Anthony D. Andora* and *Joseph M. Andresini,* on the briefs).

*John E. Garippa* and *Philip J. Giannuario* submitted a brief on behalf of *amicus curiae* Motor Vehicle Manufacturers Association (*Garippa & Trevenen,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This is a municipal-tax case involving the valuation of Ford Motor Company's auto-assembly plant in Edison, New Jersey. The Ford Motor Company (Ford) challenged the local property tax assessments for the years 1983, 1984, and 1985 and sought reduction, alleging that the Township of Edison (Edison) had significantly overassessed the property. The value was set at approximately $28 million for 1983. Ford believes that its value is half of that. Edison believes that its value is almost half-again greater.

The appeal involves four issues: (1) whether the property is special or general purpose in nature; (2) whether, if it is general purpose, its highest and best use is as an auto-assembly plant, as opposed to a diversified general-purpose manufacturing facility; (3) whether the Tax Court erred in rejecting four comparable sales of general-purpose manufacturing facilities; and (4) whether the Tax Court abrogated its duty to make an independent determination of true value by relying on the presumptive reliability of a County Tax Board judgment and

the original municipal assessments. We hold that the property is general purpose in nature; that the Tax Court did not limit its consideration of value to the use of the plant as an auto-assembly plant; and that the Tax Court did not err in its treatment of the proffered comparable sales. Finally, although the Tax Court should have made its own determination of value in the face of the evidence presented, the Tax Court's failure to do so does not warrant a remand.

I

Although the case involves three separate tax years, 1983, 1984, and 1985, for ease of analysis we shall refer principally to the 1983 tax year. A more comprehensive recital of the facts and issues is set forth in the reported Tax Court opinion, 10 *N.J. Tax* 153 (1988).

Ford's auto-assembly plant is one of the state's major industrial facilities. The property covers 76.54 acres of land and has 2900 feet of frontage on Route 1, one of the state's main corridors. Ford's auto-assembly complex consists of three main buildings (an assembly building, warehouse, and two-story administration building) and six outbuildings, occupying a total area of 1,350,162 square feet. (To put that in perspective one would have to envision the enclosure of about twenty-four football fields.) The property has been significantly improved over the years and now consists of a paved lot that provides parking for approximately 1600 cars, chain-link fencing, exterior lighting, water and fuel tanks, and extensive truck-docking capabilities and rail lines. The property also has the benefit of all public utilities, including water, sewer, gas, and electric. During the relevant time period, Ford used the property for the assembly of its Escort and Lynx automobiles.

The original assessment for the tax year 1983, following a revaluation of all properties in Edison, was $20,957,600, consisting of $3,827,000 for land and $17,130,600 for improvements. Edison appealed that assessment to the Middlesex County

Board of Taxation (the County Board). The County Board increased the assessment on the property for the 1983 tax year to $28,422,000, consisting of $3,827,000 for land and $24,595,000 for improvements. Both parties appealed the County Board's judgment to the Tax Court: Edison sought an even greater increase in the assessed value of the property for the 1983 tax year, Ford a reduction. The property was reassessed at $28,-422,000 for 1984 and 1985. Ford and Edison appealed those assessments directly to the Tax Court. The 1983, 1984, and ·1985 appeals were consolidated, and the case was tried for sixteen days before the Tax Court.

Despite much anecdotal and now outdated evidence about the "high-tech" capacity of the plant and the profitability of robotics in the assembly of the Lynx and Escort automobiles (at one point Edison proffered the comments made by Ford officials at a Chamber of Commerce meeting (as the theme from the movie "Rocky" played in the background) that this was "the most efficient plant east of Tokyo" producing a "world class car" because of the "quality of labor" in the community), the case came down to an evaluation of expert-opinion evidence.

Ford's appraisal expert, Jeffrey Parkhouse, testified that as of October 1, 1982, the fair market value of the property was $14,500,000 for the 1983 tax year. Because 1983 was a revaluation year, he did not apply an equalization ratio. Parkhouse arrived at his estimate of value by applying the market-data and cost approaches to valuation. In applying the market-data approach, Parkhouse reviewed and analyzed market data involving several thousand property transactions. Parkhouse then used five sales of improved general-purpose manufacturing-warehouse facilities for the 1983 and 1984 tax years, and included an additional sixth sale for the 1985 tax year. Parkhouse made percentage adjustments to the unit price of each comparable property to reflect comparisons between the comparable and Ford's property.

Parkhouse also used the cost approach to valuation, relying on the Marshall Valuation Service Manual for determining the value of the improvements and a market-value analysis for the value of the land. Although Parkhouse also considered the value of the property by means of the income approach, he did not rely on the results of that approach in reaching his final estimate of value.

Based on a survey of national demand for large industrial properties, an analysis of comparable sales, and a review of population, work force, taxes, and labor, Parkhouse concluded that the property's highest and best use is as a general-purpose manufacturing facility. One of Ford's engineers described the relative ease of removing the machinery and equipment from the plant, having gained that experience in retooling the Edison plant on prior occasions and in removing the equipment from the Ford plant in Mahwah before it closed in 1980.

Edison countered with the testimony of Barry J. Polayes, of National Valuation Services, Inc., regarding the value of the property, and Oliver B. Spence on the cost figures. Polayes concluded that the fair market value of the property as of October 1, 1982, was $30,000,000 for the 1983 tax year and as much as $36,000,000 for the 1985 year. Polayes estimated the value of the property by means of cost and income approaches. Polayes did not prepare a market-data analysis because he did not consider any of the property sales that he reviewed to be comparable to the Ford property.

Edison contested Parkhouse's conclusion that the plant's highest and best use was that of a general-purpose manufacturing facility. Edison emphasized the plant's special features, such as the extensive plumbing facilities needed in the painting process, the strong steel structure and concrete flooring throughout, extensive boiler capacity, extra-heavy electric capacity, miles of air compressor lines, water-cooling lines, and specialized paint facilities. Those features led Edison to con-

clude that the building would be under used by most general-purpose manufacturers.

Edison's emphasis on the plant's special features was reflected in its pretrial position that the property was a special-purpose facility—that is, a facility that could not, without extensive expenditures, be converted to any other use. By the time of trial, the parties had the benefit of a decision by the same Tax Court judge in connection with the same 1983 revaluation of another major manufacturing facility in Edison. See *WCI–Westinghouse, Inc. v. Edison Township,* 7 *N.J. Tax* 610 (1985), *aff'd o.b.,* 9 *N.J. Tax* 86 (App.Div.1986). The Westinghouse plant was close to one million square feet and in close proximity to the Ford property. The Tax Court held in that case that the Westinghouse plant was not a special-purpose facility but rather that its highest and best use was as a general-purpose manufacturing-warehouse facility. *Id.* at 617.

Much of the argument in this case then focused on whether the highest and best use of Ford's property would encompass any use other than as an automobile-manufacturing facility or an allied use. Also at issue was whether there is a market demand for the property as an automobile-manufacturing facility. Edison attempted to show that demand for auto-assembly use or an allied use was demonstrated by at least two of the comparables relied on by Parkhouse in his market-data approach.

Following the sixteen-day trial in the Tax Court, the New Jersey Legislature enacted Laws 1986, chapter 117, which established new criteria for determining whether property is taxable as real property. That law was made applicable to pending appeals. Edison moved before the Tax Court to reopen the proofs and for additional discovery, arguing that the property contained a number of items and systems that Edison's appraisers did not consider as constituting real property but would affect its value under the new law. The Tax Court granted Edison's motion to reopen the case. Counsel for Ford

then requested that the Tax Court render its valuation determination with regard to the proofs that had been adduced at the original trial. The Tax Court found Ford's request to be well founded, agreeing that such a determination

> would be helpful to the parties, and perhaps even be conducive to settlement negotiations, and thus obviate what is anticipated to be a protracted trial on the issue of whether the items to which Edison now makes reference pursuant to *c.* 117 should be deemed, and assessed as, realty. [10 *N.J. Tax* at 157–58.]

The Tax Court held that neither Ford nor Edison had sustained its requisite burden of proof in seeking to overturn the 1983 judgment and the revised assessments for 1984 and 1985. Ford appealed the Tax Court decision, as did Edison. Edison later abandoned its cross-appeal. The Appellate Division affirmed the Tax Court decision. 12 *N.J. Tax* 244 (1990). One member of the panel dissented, concluding that "[t]his is an unsatisfactory result, not worthy of the considerable and otherwise commendable efforts expended by the trial judge. Something like a well-tailored garment constructed with only one sleeve." *Id.* at 249. The dissenting member would have reversed the Tax Court's decision and remanded to fix the value of the improvements on the property.

Ford appealed this issue as of right under *Rule* 2:2–1(a). We granted Ford's petition for certification to consider the other issues raised in the appeal. —— *N.J.* —— (1991).

## II

### A.

#### The Ford Auto–Assembly Plant is a General–Purpose Property.

"Equality of treatment in sharing the duty to pay real estate taxes is a constitutional right." *Murnick v. City of Asbury Park*, 95 *N.J.* 452, 458, 471 *A.2d* 1196 (1984). All real property must be assessed at true value. In New Jersey, the concept of true value has been expressed in terms of the price that could be obtained for the property in money at a fair sale

between a willing buyer and a willing seller. *New Brunswick v. State, Div. of Tax Appeals,* 39 *N.J.* 537, 543, 189 *A.*2d 702 (1963). In the case of certain properties, conventional market theories are not readily adaptable. "[C]ourts of this state have long recognized that for certain types of unique property that were constructed for a special purpose and are only suited for that particular purpose, the market and income approaches to value are not applicable." *Transcontinental Gas v. Bernards Township (Transcontinental* II), 111 *N.J.* 507, 526–27, 545 *A.*2d 746 (1988); *see, e.g., Hackensack Water Co. v. Borough of Old Tappan,* 77 *N.J.* 208, 215, 390 *A.*2d 122 (1978) (Handler, J., dissenting); *CPC International v. Borough of Englewood Cliffs,* 193 *N.J.Super.* 261, 269–70, 473 *A.*2d 548 (App.Div.1984) (discussing other cases). "With regard to such special purpose property, the cost approach is usually relied upon for property tax valuation purposes." *Transcontinental* II, *supra,* 111 *N.J.* at 527, 545 *A.*2d 746; *see, e.g., Pantasote Co. v. City of Passaic,* 100 *N.J.* 408, 412, 495 *A.*2d 1308 (1985); *Dworman v. Borough of Tinton Falls,* 1 *N.J. Tax* 445, 452 (Tax 1980). However, a property does not qualify as special purpose "where it possesses certain features which, while rendering the property suitable to the owner's use, are not truly unique." *Sunshine Biscuits, Inc. v. Borough of Sayreville,* 4 *N.J. Tax* 486, 495 (Tax 1982). Special-purpose property is most easily understood in terms of property that "cannot be converted to other uses without large capital investment," such as a public museum, a church, or a highly-specialized production facility like a brewery. *Id.* at 495 n. 3.

■ Because of Edison's great emphasis on the "special features" of the property—its heavy steel framing, its spray-paint booths and baking ovens, its massive boilers, its terrazzo and tile amenities, the Appellate Division may have been led to refer to the property as "special-purpose property." Both Ford and Edison have agreed that the property does not qualify as "special-purpose property," regardless of their disagreement concerning the limits on the market for this property.

## B.

*The Tax Court did not restrict its consideration of value of the plant to that of automobile assembly.*

Had the Tax Court limited its consideration of value to the current use of the property as an auto-assembly plant, it would have reached by the back door much the same result as would have been reached by classifying the property as "special-purpose property." The narrower the uses that can be considered, the narrower the market that can be relied on to establish value with the concomitant necessity to rely on cost as an estimate of value.

Just how wide is the range of difference that that approach can produce was demonstrated in the examination of Edison's expert appraiser. The appraiser had estimated the value of Ford's assembly plant at Mahwah at approximately $80 million for the 1982 and 1983 tax years. When Ford closed the Mahwah plant and turned to the market to find value for its property, the market valued the property at $20 million in 1984. The appraisals in this case are not quite so far apart, but the differences are significant and the potential effect of a misjudgment about the highest and best use of the property is great.

The irony of the debate about highest and best use is that historically the taxing authorities have sought to expand consideration of value beyond current uses. Assessment at current use "is an alternative to the highest and best use standard, and generally results in a reduced assessment." Joan M. Youngman, *Defining and Valuing the Base of the Property Tax,* 58 *Wash.L.Rev.* 713, 764 n. 220 (1983) (Youngman). In *Inmar Associates, Inc. v. Township of Edison,* 2 *N.J. Tax* 59, 64 (1980), the Tax Court explained that "[a]ny parcel of land should be examined for all possible uses and that use which will yield the highest return should be selected." That use is known as the "highest and best use," and has been defined as " 'the use that at the time of appraisal is the most profitable, likely use' " or alternatively, " 'the available use and program

of future utilization that produces the highest present land value.' " *Id.* at 64–65 (quoting the American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 43 (7th ed. 1978)).

A concomitant of a highest and best use, however, is that consideration of the use has as a prerequisite a probability of achievement. "The projected use cannot be remote, speculative or conjectural." *Id.* at 65. Thus, in many, if not most, instances the property owner points to the somewhat shabby current use of the property as indication of value, and the taxing authority points to available uses and programs of future use that can produce higher values. *See* Youngman, *supra,* 58 *Wash.L.Rev.* at 764–65.

Property valuation at highest and best use, then, requires the appraisal of each parcel " 'as though it were being put to its most profitable use, given probable legal, physical and financial constraints.' " *Id.* at 764 (quoting International Association of Assessing Officers, *Improving Real Property Assessment* 425 (1978)). "It simply implements a market value standard identifying highest and best use by reference to prices bid for the property in light of all of its possible legal uses." *Id.* at 764. That view has been regarded as "a reaction to taxpayer manipulation of 'functional obsolescence,' * * * a ready argument for reducing the assessment of almost any structure below its reproduction cost less physical depreciation." *Id.* at 764–65.

Youngman's *Washington Law Review* article cites our 1978 decision, *Hackensack Water Co. v. Borough of Old Tappan, supra,* 77 *N.J.* 208, 390 *A.*2d 122, as "a particularly interesting example" of that problem. 58 *Wash.L.Rev.* at 765. There, because of extensive costs needed to restore underwater property to its highest and best use as residential property, the property owner sought to invoke the doctrine as a way of reducing its assessments. *Hackensack Water Co., supra,* 77 *N.J.* at 211–13, 390 *A.*2d 122. The Court rejected that notion saying, "[u]nderlying the settled rule that remote uses are

irrelevant is the more basic principle that property valuation should have some relationship to reality, and the reality of the matter is that the land is useful as a reservoir." *Id.* at 214, 390 *A.*2d 122 (citation omitted). The Court thus valued the land as special-purpose property at the original cost to the water company. *Id.* at 216, 390 *A.*2d 122. *But see id.* at 223, 390 *A.*2d 122 (Handler, J., dissenting); *Transcontinental* II, *supra,* 111 *N.J.* at 518, 545 *A.*2d 746.

■ A more pointed example is found in a recent Oregon Tax Court decision involving functionally obsolescent offices occupied by a manufacturer in a largely industrial and warehousing part of the community. *Meyer v. Department of Revenue,* ⸺ *Or.Tax* ⸺, No. 3049, 1991 WL 244494 (Nov. 20, 1991). There, the taxing authority sought to denote the highest and best use of the property as its current use for office space and to compare the property in value to office towers located in other areas of the community. The Oregon Tax Court disagreed. "What must not be forgotten is that the test of true cash value is a market test. It does not matter whether a property is overused or underused by a particular owner. The question is: What use would the market make of that property?" 1991 WL 244494 at 2. The Tax Court emphasized that the concept of highest and best use is based on market forces. " 'When the purpose of an appraisal is to estimate market value, highest and best use analysis identifies the most profitable, competitive use to which property can be put. Therefore, highest and best use is a market-driven concept.' " *Ibid.* (quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 269 (9th ed. 1987) (hereinafter *The Appraisal of Real Estate*)). Only the "market driven" value in exchange, not the value in use to Ford, should identify the highest and best use of the property. (Obviously, there are situations in which the relationship between cost and market will not always determine value. A wise judge noted long ago: "If this be not so, a citizen, by the erection of a residence so costly that no one could buy it, would escape all taxation, which is obviously not

the intent of the legislature or the proper interpretation of its statute." *Turnley v. City of Elizabeth,* 76 *N.J.L.* 42, 44, 68 *A.* 1094 (Sup.Ct.1908).)

Ford thus argues that the trial court erroneously characterized the highest and best use of the property as an auto-assembly plant because there was insufficient credible evidence of a market demand for such use in the record. Ford argues that the trial court's determination of market demand was broader than the category of use found to be the property's highest and best use—automobile assembly. The Tax Court disagreed, and found that the record demonstrated that there existed a relevant market for automobile-assembly plants "either in continued use or in a kindred use." 10 *N.J. Tax* at 164.

The Tax Court concluded that the highest and best use of the property was its current use, as an auto-assembly plant. *Id.* at 167. On the premise that the Tax Court erroneously limited its consideration of value to the current use as an auto-assembly plant, Ford argues that it was illogical for the Tax Court to rely on the "Ford Motor Company to Northrop Corporation sale"— automobile plant to aircraft—as demonstrating market demand, concluding that without the Ford to Northrop sale the trial court would have only one sale—"Volkswagen of America to Chrysler Corporation" sale—an insufficient proof of demand for auto-assembly use.

We find Ford's argument to be too finely spun. The record is clear that the Tax Court considered the highest and best use of the property to be for auto assembly or kindred heavy-industrial-type purposes. The trial was well contested on the question of just how the market would view the Ford plant. In Ford's view, the plant's auto-assembly capacity would be largely irrelevant to its market uses. Ford argued that when emptied of its machinery and equipment, its assembly plant would be "[n]othing but one big open space, that's all." The case was sharply focused on this issue during the cross-examination of Edison's expert, Polayes:

Q  Mr. Polayes, on redirect did you misspeak when you stated the highest and best use of the subject property was to continue it in a similar use?
A  To continue it in the same or like use, no, I didn't misspeak.
Q  Now, I refer you to [your appraisal report].
A  Yes.
Q  Where you there conclude that the highest and best use of the property is a continuation of its present use, is that correct?
A  Well, that would be what I was referring to.
Q  So, well, the present use is as an automobile manufacturing facility, correct?
A  And a similar use, as I indicated, would be tractor, large truck, or small plane assembly which would be also included in its present use.
Q  So it is your testimony that the highest and best use of this facility, is as a manufacturing facility for items such as automobiles, air crafts, farm equipment, and certain of the items that you've mentioned?
A  Yes.
Q  So in effect it would be more akin to a general purpose manufacturing facility?
A  Absolutely not.
Q  At what point do you get between a general purpose manufacturing facility and a point where the sole purpose and use of this facility can be for automobile manufacturing?
A  Well these are very similar to automotive manufacturing. They would be producing a large quantity or a reasonably large quantity of a large item, as you got to larger items the quantity would drop off some. But in terms of where it would not be considered to be a similar use, a similar enough use, it would be one that doesn't recognize the special features that have been enumerated a number of times in this report.

In *WCI–Westinghouse, Inc. v. Edison Township, supra,* 7 *N.J. Tax* 610, the Tax Court found a facility that had been used to manufacture and warehouse a variety of items ranging from radios, portable appliances, fuses, television sets, phonographs, hair-dryers, hair-curlers, to air-conditioners and dehumidifiers to be a general-purpose manufacturing-warehouse facility. Ford argues that its facility should also be characterized as a general-purpose manufacturing facility. We cannot say, however, that on this record the Tax Court abused its discretion in determining within what market or sub-market the property would be viewed in exchange. Because the kindred use as a heavy-manufacturing facility is a "reasonably probable and legal use" of the improved property that is "physically possible,

appropriately supported, financially feasible, and [one] that results in the highest value," *The Appraisal of Real Estate, supra,* at 269, we cannot say that the Tax Court abused its discretion in determining that auto assembly and kindred uses is the Edison plant's highest and best use.

◼ The Tax Court observed that many of the plant's capabilities would be under used because "potential [general-manufacturing] purchasers would, and could, not take full advantage of the amenities offered by the property, and thus, would not be interested in paying for these items, but an automobile manufacturer or kindred user would." 10 *N.J. Tax* at 164. Without going into a detailed description of the plant, that the plant is more than adequate for the needs of the general manufacturer is clear. Its electrical, steam, compressed air, and plumbing systems far exceed normal industrial requirements. The Appellate Division apparently believed that the Tax Court was focusing on the special-purpose property market instead of the industrial property market in its narrowing and elimination of the comparables. We believe, however, that the Tax Court was focusing on the industrial property market; it merely engaged in "market segmentation" (a process by which sub-markets within a larger market are identified and analyzed) to establish what properties, if any, were most comparable to the Ford property. *The Appraisal of Real Estate, supra,* at 47.

## C.

### *The trial court did not err in the treatment of the four comparables offered by Ford.*

We digress for a moment to put the issue in perspective. From the first day of trial that the key to this case was the weight to be given to the Parkhouse analysis of the comparables became apparent. Parkhouse used those comparables to establish not only his market-data approach but a critical feature in the reproduction-cost analysis as well, namely, the extent of the property's depreciation. In objecting to the initial

receipt into evidence of the comparables in the Parkhouse appraisal report, Edison argued:

> Mr. Parkhouse makes adjustments to those sales and then analyzes the comparable sales and utilizes that data in order to carry over a factor of accrued depreciation, presumably physical as well as obsolescent from several sources, to the subject property that's under appeal. *The whole correctness and relevancy of that adjustment from a cost approach and also adjustment of his market data approach would hinge upon the admissibility of those sales.* (Emphasis added.)

We do not presume to have gathered the full significance of the analytical differences between the use of the replacement-cost computations under the Marshall Valuation Manual or the R.S. Means cost service. We do know that the use of each involved a large measure of discretion. The Marshall manual's area perimeter table did not directly address the reproduction of buildings in excess of 400,000 square feet, thus Parkhouse had to make assumptions in order to extrapolate a perimeter multiplier for a building in excess of one million square feet. The Tax Court found that it could not verify the accuracy of Parkhouse's assumptions. 10 *N.J. Tax* at 187.

In support of his adjusted age-life methodology, Parkhouse derived a range of depreciation from the sales that he used for his market-data approach. Recall that Edison's experts questioned whether the Marshall valuation method was adaptable to this case. One expert indicated that the calculator-cost sections of the manual provide only a generalized description of a particular classification, and thus to place the Ford plant within the general classifications of the manual is extremely difficult. Additionally, the classifications do not take into consideration the special features in the Ford plant, such as the electrical power capacity, waste treatment systems, air compressors, and the elaborate plumbing, all of which are necessary to accommodate the automobile-assembly process or the kindred uses contemplated by the Tax Court. Because Edison did not appeal to us, we need not review the Tax Court's analysis of its methodology of cost evaluation. The Tax Court noted, however:

> My review of the evidence relative to the cost approach as employed by both parties leads to the conclusion that the criticisms of both parties are right. I am not convinced by a fair preponderance of the evidence that either party provided a credible estimation of fair market value for the subject by means of a cost approach methodology. [10 *N.J. Tax* at 186–87.]

Hence the importance of comparable sales.

Ordinarily, the issue of comparable sales arises in the context of admissibility. The easiest setting in which to understand the use of comparable sales is that of a residential subdivision of tract homes. If there had been four or five sales of similar properties within one or two blocks of each other in such a development, such comparable sales would surely be admissible and would be the clearest indication of proof. *See Moorestown Township v. Slack,* 85 *N.J.Super.* 109, 115, 204 *A.*2d 23 (App. Div.1964) (sales of 121 lots in a Moorestown Heights tract). To find such sales in the context of a case like this is not so easy. The general principles are now stated that

> [n]otwithstanding the "substantial similarity and conditions" test for admissibility of comparable sales * * * there is pronounced recognition * * * that such similarity need not obtain in *all* comparative respects, so long as there is sufficient similarity in *some* significant respects to permit the expert testifying, or the fact-finder, to draw rational probative valuation inferences from the sales cited, after weighing and allowing for such differences as do obtain between the properties sold and that which is the subject of the valuation litigation. The weight to be accorded the sales, either as direct evidence of value or as support for the expert's opinion of value, is for the fact-finder. [*Id.* at 114, 204 *A.*2d 23.]

Appellate courts have long recognized that the trial court must be granted "a wide discretion" in determining the admissibility of sales sought to be relied on as comparable. *County of Los Angeles v. Faus,* 48 *Cal.*2d 672, 312 *P.*2d 680, 684 (1957).

■ Ford argues that the Tax Court rejected as a matter of law four of the six offered comparables on the sole basis that

> none of the sale properties were substantially similar to the subject in economic characteristics because they were not of the same highest and best use, *i.e.,* an automobile assembly plant. Therefore, I am of the opinion that these sales save for Parkhouse's sales number one and four do not materially assist in any value determination for the Ford facility. They are simply not comparable. [10 *N.J. Tax* at 170–71 (footnotes omitted).]

The four excluded sales were of large industrial properties that ranged in size from 819,000 to 1,020,000 square feet; indeed, several were industrial properties in the same geographic area as Ford's property. The Tax Court excluded the following comparable sales: Lily Tulip to Harve–Realty Corporation sale, a 1,020,000 square foot industrial facility located in Holmdel Township, New Jersey; the Owens–Illinois, Inc. to Hartz Mountain group sale, a 903,000 square foot glass plant in North Bergen Township; the Eaton Corp. to Kelsy–Hayes Co. sale, an 819,000 square foot industrial facility in Philadelphia, Pennsylvania; and the Fedders USA, Inc. to Z–Edison sale, a 1,000,000 square foot industrial facility located in Edison Township. Ford proffers that the four offered comparables, although not used as automobile-assembly plants, were similar in that they were all large industrial facilities. Its expert had adjusted the comparables for land-to-building ratio, size, time, and condition.

■ Had this case been tried to a jury, we would be hard pressed to sustain the exclusion of those comparables from consideration by a jury. In *State v. Azzolina Land Corp.*, 101 *N.J.Super.* 103, 243 *A.*2d 276 (1968), Judge Conford, writing for the Appellate Division, emphasized that "[e]vidence of sales cited by an expert serves the function both of independent evidence for the fact-finder and support for the expert's opinion value. The latter factor should generally exert a liberal influence on admissibility." *Id.* at 108, 243 *A.*2d 276 (citing *Delaware, L. & W. R.R. v. City of Hoboken*, 10 *N.J.* 418, 434, 91 *A.*2d 739 (1952)). Generally speaking, comparable sales include all sales that will lend logical, coherent support if they show "comparable building density ratios, functional similarities, proximity of sale dates to assessing dates, similarity of age, construction and condition, and in some cases, size." *Shulton, Inc. v. City of Clifton*, 7 *N.J. Tax* 208, 218 (Tax 1983), *aff'd*, 7 *N.J. Tax* 220 (App.Div.1984). We would not assume that a functional similarity is a synonym for a demand for an identical highest and best use. The sales would appear to lend logical support to the expert's opinion. Edison's expert had asserted

before a Michigan tax body that even sales of "remotely comparable" property were sufficient to compare large industrial sales.

In this case, however, although the issue is posed in terms of rejection of the comparables, the qualitative issue is really what weight should have been given to the sales. Although the Tax Court did not extensively review in its opinion the specifics of each sale, the parties did, in the course of the trial. Were we to remand this matter to the Tax Court to consider the weight it might give to those four sales as part of its overall analysis of the market approach as determinative of value, we doubt that the Tax Court's disposition would be altered.

There were many problems with those sales that would have limited their value to the Tax Court in using the market-data approach. Edison's brief points out that there was extensive cross-examination about the probative value of those sales, and we but briefly summarize some of those observations. The Lily–Tulip sale had substantially more warehouse and less manufacturing space than the Ford property—55% warehouse, 33% manufacturing for the comparable, versus 13% warehouse for the Ford facility. Lily's electrical capacity was substantially less; its sewage treatment was an on-site package treatment plant, versus Ford's extensively-developed pretreatment facilities, including access to public sewers; the Lily facility had two wells, rather than a public water supply; and it had substantially inferior road access. Parkhouse admitted that he had not inspected the interior of the Lily–Tulip plant at the time of appraisal.

Edison challenged the Owens–Illinois to Hartz Mountain sale. That property had been a glass-manufacturing facility. It had no heating capacity other than from the industrial furnaces and was severely depreciated. One of the leading developers in the Meadowlands area purchased the property and planned to convert it to a multi-use purpose.

The Eaton Corporation to Kelsy–Hayes sale was of a general-purpose manufacturing plant in the Route 1 corridor, but in the Philadelphia area. That plant had been closed for several years prior to the sale. It too had been in a state of disrepair. The sale's comparability was diminished by the fact that the "high potential commercial value" of the frontage had been realized shortly after the sale when the property was sold for retail shopping-center purposes. Finally, the Fedders Corporation to Z–Edison sale involved a sale from a single user to a multi-tenancy use. Previous uses for the Fedders facility included storage and distribution.

In short, the asserted functional dissimilarities and the differences in construction and market conditions lead us to believe that whatever mistake of law might have been made in not considering the sales was for all practical purposes harmless in the context of this litigation.

## D.

*The Tax Court should have exercised its responsibility to make its own determination of value but its failure to do so does not warrant a remand.*

After sixteen days of trial, the Tax Court decided that it was in no better position than was the County Board to determine value. There is a paradox here. The County Tax Board increased the assessment of the Ford plant from $20,957,600 to $28,422,000 following a half-day proceeding. Yet we give to its judgment the same presumption of validity as attends an original assessment. *Pantasote Co. v. City of Passaic, supra,* 100 *N.J.* at 417, 495 *A.*2d 1308. Long ago, Justice Brennan questioned the value of such presumptions: "Is it not understandable that we query here, as we did in another case, whether the judgments 'are predicated upon facts or speculation and if upon facts, what facts?'" *Delaware, L. & W. R.R. v. City of Hoboken, supra,* 10 *N.J.* at 427, 91 *A.*2d 739 (quoting *In re*

*Arbitration Between New Jersey Bell Tel. Co. v. Communication Workers of Am.,* 5 *N.J.* 354, 375, 75 *A.*2d 721 (1950)).

The Appellate Division recognized the "apparent anomaly of the judge's conclusion, after 16 days of trial, that the proofs were insufficient to permit him to determine true value, and we assume that this result is extraordinary." 12 *N.J. Tax* at 247. But the dissent in the Appellate Division pointed out that

[t]he failure to make the ultimate finding of valuation in these tax appeals is not an extraordinary event. *See WCI–Westinghouse, Inc. v. Edison Tp.,* 7 *N.J. Tax* 610, 617 (Tax Ct.1985) ("in this case I am not satisfied that either party sustained the requisite burden of proof"). We affirmed that holding in a brief *per curiam* opinion. 9 *N.J. Tax* 86, 87 (App.Div.1986). *See also Foreign Trade Zone v. Mt. Olive Tp.,* 242 *N.J.Super.* 170, 175 [576 *A.*2d 303] (App.Div.1990) ("where neither party carries the burden of proof of establishing the value, the original assessment should stand"). What started as an aberration has now acquired the stature of a legal proposition, one with its own life. [12 *N.J. Tax* at 250 (Stein, J.A.D., dissenting).]

In *Glen Wall Associates v. Township of Wall,* 99 *N.J.* 265, 491 *A.*2d 1247 (1985), we emphasized that the Tax Court has an obligation to use its " 'special qualification[s], knowledge and experience' " in reaching a determination of value. *Id.* at 280, 491 *A.*2d 1247 (quoting *N.J.S.A.* 2A:3A–13). The premise of *Glen Wall* is that because of the Tax Court's special expertise in these matters, it " 'has not only the right[ ] but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question.' " *Id.* at 280, 491 *A.*2d 1247 (quoting *New Cumberland Corp. v. Borough of Roselle,* 3 *N.J. Tax* 345, 353 (Tax 1981)).

In *Inmar Associates, Inc. v. Borough of Carlstadt,* 112 *N.J.* 593, 609, 549 *A.*2d 38 (1988), we found that the proofs raised a sufficient challenge to the correctness of the municipal assessment to require the Tax Court to exercise its independent judgment as to value. *Inmar* presented a much more difficult valuation problem than is present in this case. In remanding the case to the Tax Court, we affirmed our belief in

the unique capability and responsibility of the Tax Court to exercise its power, in circumstances where the presumption of validity of the local assessment does

not apply, to use the information available to it and to make an independent determination of value. *Transcontinental Pipe Line, supra,* 111 *N.J.* at 538–40 [545 *A.*2d 746 (1988) ] (citing *F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 430–31 [495 *A.*2d 1313] (1985); *Pantasote Co. v. City of Passaic,* 100 *N.J.* 408, 416 [495 *A.*2d 1308] (1985); *Glen Wall Assocs. v. Wall Township,* 99 *N.J.* 265, 280 [491 *A.*2d 1247] (1985)). [*Ibid.*]

*See also Samuel Hird & Sons, Inc. v. City of Garfield,* 87 *N.J.Super.* 65, 73, 208 *A.*2d 153 (App.Div.1965) (recognizing expertise); *New Cumberland Corp. v. Borough of Roselle, supra,* 3 *N.J. Tax* at 352 (describing duty of Tax Court); *Almax Builders, Inc. v. City of Perth Amboy,* 1 *N.J. Tax* 31, 39 (Tax 1980) (holding that it is right and duty of Tax Court to apply its own judgment).

■ County Tax Board judgments do carry a presumption of correctness. To demand " 'definite, positive and certain evidence in quality and quantity to overcome the presumption' " is for the Tax Court. *Pantasote, supra,* 100 *N.J.* at 413, 495 *A.*2d 1308 (quoting *Aetna Life Ins. Co. v. City of Newark,* 10 *N.J.* 99, 105, 89 *A.*2d 385 (1952)). One court has held, however, that "[t]he so-called 'presumption' ha[s] no artificial probative force once substantial evidence to the contrary [has been] adduced," *Samuel Hird & Sons, Inc. v. City of Garfield, supra,* 87 *N.J.Super.* at 74, 208 *A.*2d 153, and "[o]nce the 'presumption' is met it was the duty of the Division [predecessor to the Tax Court] to appraise the testimony and make findings of fact." *Van Realty, Inc. v. City of Passaic,* 117 *N.J.Super.* 425, 430, 285 *A.*2d 52 (App.Div.1971) (citing *Samuel Hird & Sons, Inc. v. City of Garfield, supra,* 87 *N.J.Super.* at 75, 208 *A.*2d 153).

[O]nce sufficient competent evidence is produced and the presumption overcome, the matter is not thereby concluded in favor of the complaining party. The court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence. When the court rejects the ultimate conclusions as to the true value proffered by the parties' experts, it should make an independent determination of true value on the basis of those portions of the experts' testimony which the court finds credible. [*Pennwalt Corp. v. Township of Holmdel,* 4 *N.J. Tax* 51, 55–56 (Tax 1982) (citing *Samuel Hird & Sons, supra,* 87 *N.J.Super.* 65, 208

*A.2d* 153; *Almax Builders, Inc. v. City of Perth Amboy, supra,* 1 *N.J. Tax* 31; *City of Newark v. 1013 Corp.,* 1 *N.J. Tax* 107 (Tax 1980)).]

In this case there was enough evidence presented in Ford's case-in-chief to overcome the presumption of correctness. When an original assessment is unreliable, the Tax Court may not invoke its presumptive correctness and must establish value, *Foreign Trade Zone v. Township of Mount Olive,* 242 *N.J.Super.* 170, 174, 576 *A.*2d 303 (App.Div.1990), even if it means coming to a determination contrary to both experts.

In the recent *General Motors Corp. v. City of Linden,* 12 *N.J. Tax* 24 (1991), the Tax Court made specific adjustments to indications of value by expert witnesses to arrive at true value. We realize that that case involved a more discrete issue of differing depreciation rates, for example, for "fitups and mechanicals." In addition, it appears that the property was treated as "special purpose," and finally, the difference in opinions about the value of the property was even more varied than here. The taxpayer's claimed value for 1983 was $22,000,000; Linden's claimed value was $132,940,000. But there are several other instances in which the Tax Court has rejected the conclusions of both experts and made independent findings of true value. See *Pennwalt Corp. v. Township of Holmdel, supra,* 4 *N.J. Tax* at 55–56; *Buchler v. Borough of Fort Lee,* 2 *N.J. Tax* 228, 239 (1981); *City of Newark v. 1013 Corp., supra,* 1 *N.J. Tax* at 113.

On this record we think that the Tax Court should have made an independent determination of the true value of the property. Hence, we seriously questioned whether to remand the matter to the Tax Court for further proceedings to the end that it make a definitive determination of value. (The Tax Court apparently accepted Parkhouse's appraisal of land values.) We hesitate, however, because of a felt sense that the Tax Court found a rough measure of justice in the assessment. The Tax Court was extremely familiar with conditions in Edison Township, having recently concluded the WCI–Westinghouse hearing. See *WCI–Westinghouse, supra,* 7 *N.J. Tax* 610. Remem-

ber that the Township had been pressing the Tax Court for a $36 million assessment for this property in the face of a municipal revaluation assessment of about $20 million. Ford appealed the 1983 revaluation assessment only after Edison sought to increase further the revised assessment value rendered by the County Board.

Hence, we conclude that what invested the County Board's judgment with presumptive validity had to have been the Tax Court's own evaluation that there was absent from the case "any strong indication * * * that the *quantum* of the assessment was far wide of the mark of true value * * *." *Pantasote, supra,* 100 *N.J.* at 414–15, 495 *A*.2d 1308. For it is precisely when the *quantum* of such an assessment (or, as here, a County Board judgment) "under all of the attendant circumstances is so far removed from the putative true value of the property that it deservedly loses its protective presumption of validity." *Id.* at 415, 495 *A*.2d 1308.

This was an extraordinarily thorough and painstaking trial. Perhaps precisely the thoroughness of the presentation led the court to decline to dismiss at the close of plaintiff's case on the basis that Ford had presented sufficient evidence at that time to overcome the presumption of correctness. The Tax Court said at the time of Edison's motion: "I think that it is clear that the appraisal and the testimony of the expert witness clearly overcomes the presumptions of correctness that attach[ ] to the County Board judgment of the original assessment." That on further analysis at the close of the entire case the court declined to adopt the evidence does not discredit the court's analysis.

Like the plaintiff in a jury trial whose proofs are sufficient to withstand a motion to dismiss, see *Rule* 4:37–2(b), this plaintiff still had to persuade the factfinder to accept its proofs. For although there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remained on the taxpay-

er throughout the entire case, and in the face of defendant's proofs, to demonstrate that the judgment under review was incorrect. *See Pantasote Co. v. City of Passaic, supra,* 100 *N.J.* at 413, 495 *A.*2d 1308. This was not an eminent-domain case in which the absence of a predicate value required the tribunal to come to its own independent determination of value. There was no suggestion that the County Board's judgment was "totally unrelated to true value or * * * derived from a patently arbitrary and capricious assessment methodology." *Id.* at 417, 495 *A.*2d 1308.

The Tax Court acknowledged that it had an obligation to use its special "knowledge and expertise" in reaching a determination of value. 10 *N.J. Tax* at 200 (citing *Glen Wall Assocs. v. Township of Wall, supra,* 99 *N.J.* at 280, 491 *A.*2d 1247). But this was not a case like *Glen Wall,* in which the Tax Court disregarded an existing rent roll that demonstrated value far wide of the assessment. Nor was this case like *Van Realty, Inc. v. City of Passaic, supra,* 117 *N.J.Super.* 425, 285 *A.*2d 52, in which the Tax Court failed to explain why it rejected competent appraisal evidence. The Tax Court's opinion fully explained its reasons for not arriving at its own determination of the property's true value. And, finally, this was not a case like *Samuel Hird & Sons, Inc. v. City of Garfield, supra,* 87 *N.J.Super.* 65, 208 *A.*2d 153, in which the Division of Tax Appeals had let stand, on a presumption of correctness, two assessments for successive years that were almost diametrically opposed. In such cases the presumption of correctness had lost all significance.

Edison's expert had been frank to admit of appraisal work:

It is both an art and a science. The balance between the two is sometimes hard to define * * * it is a science to the degree that you are basing your work on empirical evidence and you are able to document each of the mathematical items on firm, empirical comparison. It is an art to the degree that * * * you have to make inferences from prior assignments * * * and to the degree that [you make] certain intuitive adjustments.

Given the final posture of this case in which the "empirical evidence," best exemplified by comparable sales was limited,

the Tax Court had to choose the result that best conformed to the proofs. We cannot help but sense that it chose the result that conformed most closely to true value. We realize that there is a gnawing uncertainty about the value of the process, however, when, after a sixteen-day trial, the sense of fitness of the assessment under review is left unarticulated.

Still, we are satisfied, as was the majority of the Appellate Division, that there was no miscarriage of justice here. The Tax Court had the benefit of its extensive familiarity with the revaluation process in Edison Township, having recently decided the *WCI–Westinghouse* case in which it had let stand the revaluation figures over the objections of both property owner and of the Township.

The parties had requested the Tax Court to make its determination as perhaps being conducive to settlement of the remaining issues in dispute. The Tax Court's judgment appears to have mooted those issues because it intended to make the Chapter 117 adjustments only if it made an independent determination of value. In the end the market will be self-correcting. Real-property taxes are but part of the cost of producing goods and services. Should the current use of this facility be priced out of the market, an unwanted certainty about the value in exchange of such an industrial property may arise.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN— 6.

*For reversal*—None.