**NOT FOR PUBLICATION WITHOUT APPROVAL OF**
**THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



MALA SUNDAR
PRESIDING JUDGE

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

May 10, 2021

Michael I. Schneck, Esq.
Schneck Law Group, LLC
Attorneys for Plaintiffs

Martin M. Barger, Esq.
Barger & Gaines,
Attorneys for Defendant

> Re:  Ashkenazi et al. v. Borough of Deal
> Block 6.02, Lot 3.01, 12 Whitehall Avenue
> Docket No. 000426-2020

Dear Counsel:

This is the court's decision following trial of the above-captioned matter deciding plaintiffs' appeal of the tax year 2020 local property tax assessment of $12,437,200,[1] on the above-captioned property (Subject), a residence located in defendant municipality (Deal). Each party's real estate appraiser used the sales comparison approach as a valuation methodology. Plaintiffs' appraiser opined the Subject's value as $10,000,000, while Deal's real estate appraiser opined it as $15,000,000.

Their difference in value opinion was predominantly due to the choice of each appraiser's comparable sales: three of the four plaintiffs' appraiser's sales were of homes outside Deal with the unadjusted sale prices between $3,850,000 and $6,750,000, whereas all four comparables of Deal's appraiser were in Deal, but two of which were vacant parcels with unadjusted sale prices between $11,800,000 and $14,200,000. Thus, and although their adjustments (type and amounts) were not widely disparate, their respective adjusted sale prices differed (plaintiffs' appraiser's adjusted sale prices were

---

[1] The assessment was allocated $10,689,100 to land and $1,748,100 to improvements.




ENSURING
AN OPEN DOOR TO
JUSTICE



$7,775,000; $10,464,000; $7,525,500; and $9,445,000 while Deal's appraiser's adjusted sales prices were $11,425,000; $14,905,000; $12,698,000; and $15,991,000).

For the reasons stated below, the court rejects plaintiffs' appraiser's comparables outside of Deal, and the one comparable in Deal, as not being credible indicators of the Subject's value. The court also rejects Deal's vacant land sale comparables since they cannot be compared or adjusted to the Subject's improved condition, which is its highest and best use. Although the court finds problematic each appraiser's valuation technique of what they deemed as surplus land, the fact is that they are not widely disparate on almost all adjustments. With most weight to the adjusted sale prices of the two improved Deal sales used by Deal's appraiser, the court finds the Subject's assessment is reasonable and therefore affirms the same.

## SUBJECT DESCRIPTION

The Subject is a rectangular lot measuring 1.857 acres located in the R-1 residential zone where the minimum lot size is 0.43 acres (18,750 square feet or "SF"). One side has frontage on Whitehall Avenue at 319± SF, and one side which directly faces the ocean has a frontage of 192± SF. View of the ocean is unobstructed.

The site is improved by a two-story single-family colonial style residence built in 1920, with a gross living area (GLA) of 5,880 SF. There are five bedrooms, five full, and 2 half baths (above grade), and another half bath in the partial basement, which is partially finished with a kitchen. There is a two-car built-in garage, a tennis court, gazebo with a wet bar, spa tub, a patio, porch, and a pond. The pictures attached to plaintiff's appraiser's report (reproduced in color) show the exterior of the home with tiled roofs throughout (including on the gazebo), raised brick borders in the rear, a brick walkway in the front (leading to the house), and two balconies to rooms fronting the street.

2

Both appraisers agree that the improvements are well maintained and of excellent construction quality. Plaintiffs' appraiser opined them as in "average" condition due to lack of any renovations or upgrades especially to the most "sellable" areas such as kitchens and bathrooms which dates to the sixties or seventies, with the tennis court needing major repairs/maintenance. Deal's appraiser opined the improvements to be in "good" condition since they were well maintained, and though some were dated, did not render them any less "good" in condition. The pictures attached to plaintiffs' appraiser's report (reproduced in color) endorse the very well-maintained interior and exterior condition of the property.

**HIGHEST AND BEST USE**

Plaintiffs' appraiser after setting forth the four elements for analysis of the highest and best use (HBU) of a property, concluded that as vacant, the HBU of the Subject was for residential development, and as improved, for "its current single-family residential use." He noted that he also considered the potential for the lot's subdivision because it was "large" however, concluded that demolition of the existing improvements was not financially feasible.[2]

Deal's appraiser's report contained his conclusion that the HBU of the Subject as vacant was for residential development in compliance with zoning. As improved, he opined the Subject's continued present use "as a single-family dwelling on an interim basis as the current improvement is nearing the end of its economic life." However, he did not analyze the alternative use(s), or when and why the use(s) was (were) more financially feasible or maximally productive than the current use. See Appraisal Institute, The Dictionary of Real Estate Appraisal, 187 (3rd ed. 1993) (defining interim use as "the

---

[2] This conclusion was based on his adjustments for lot size differences using a linear regression analysis. There, he computed the Subject's 1.857 acres as vacant to have a value of $7,975,000 less estimated subdivision approval and demolition costs of $500,000. For this conclusion, he deemed the Subject to be divisible into two lots, one "beach block" at 0.54 acres, and the balance 1.32 acres as oceanfront (though noted as "beach block" on the report, which appears to be a typographical error). Since his value conclusion for the Subject as improved was higher, his report noted that "demolition of the existing improvements . . . [was] not financially feasible."

temporary use to which a site or improved property is put until it is ready to be put to its future" HBU); Appraisal Institute, The Appraisal of Real Estate, 345-46, 354 (14th ed. 2013) ("Existing improvements that do not conform with the ideal improvement may be an interim use, i.e., not the [HBU]" and with zero or even negative contributory value, and "[a]n interim use is not the [HBU] of the property at the present time"). Here, there was no data or facts to support a conclusion that the Subject's use as improved had an alternate use, based on an analysis of the same four elements in the HBU analysis. Speculating that the improvements were at the end of their economic age does not equate to the lack of their contributory value, or support a conclusion that the Subject's use as improved, is interim.

The court therefore finds that the Subject's use as improved is for the continuation of its present use because there is nothing to support a conclusion or opinion of a more financially feasible or maximally productive use.

**VALUATION**

A complainant carries a dual burden of first overcoming an assessment's presumptive correctness, and thereafter, of persuading the court of the correct value of the property. MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373, 377 (Tax 1998); Ford Motor Co. v. Township of Edison, 127 N.J. 290, 314-15 (1992), aff'g, 10 N.J. Tax 153 (Tax 1988). The court can only determine the true value of the property based upon "the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430 (1985).

Plaintiffs' appraiser provided an opinion which was based on an accepted valuation methodology for single family homes using sales he considered comparable. As such, his opinion raises a debatable question whether the imposed assessment is accurate, and the court finds that plaintiffs have overcome the initial presumptive correctness of the assessment. The court will now examine the proffered evidence and whether it suffices to change the imposed assessment.

**APPRAISERS' VALUE CONCLUSIONS**

Plaintiffs' appraiser maintained that he would only use sales which were exposed to the market through Multiple Listing Services (MLS) or other internet-based services, and not private sales which he agreed were prevalent in Deal. Such sales, he opined, are not credible comparables since they are not exposed to the market, and further could rarely be verified to ensure its arms-length nature. While he deemed Allenhurst as competitive to the Subject's "market" (allegedly one would not know the difference between Allenhurst and Deal when driving on Ocean Avenue), he stated that he extended his search due to a paucity of ocean front homes in Monmouth County. He concluded a value of $10,000,000 based on four sales, one of which was in Deal, with adjustments (in italics) as follows:

| | Subject | Comparable One | Comparable Two | Comp. Three | Comp. Four |
|---|---|---|---|---|---|
| Address | 12 Whitehall Deal | 7 Ocean Ave Monmouth Beach | 2509 Ocean Ave Spring Lake | 112 Ocean Ave Deal | 2 Cedar Ave Allenhurst |
| Sale Price | N/A | $3,850,000 | $6,750,000 | $3,898,500 | $6,120,000 |
| Sale Date/DOM | N/A | 10/25/18; 113 days | 12/13/18; 28 days | 10/23/18; 86 days | 09/14/18; 129 days |
| Year Built | 1920 | 2018 | 2003 | 1943 | 1984 |
| Style | Colonial | Colonial | Colonial | Ranch | Colonial |
| GLA (SF)[3] | 5880 | *3611 (+340,000)* | *5420 (+69,000)* | *3580 (+345,000)* | *5156 (+108,000)* |
| Bathrooms[4] | 5.2 | *4 (+60,000)* | *3.1 (+45,000)* | *3.1 (+45,000)* | *5.1 (+15,000)* |
| Basement[5] | Full/Part Finished 1 half bath | *Crawl (+90,000)* | *Full/Unfinished (+40,000)* | *Full/Unfinished (+40,000)* | *Partial/Unfinished (+40,000)* |
| Fireplaces[6] | 2 | *1 (+10,000)* | *1 (+10,000)* | *None (+20,000)* | *3 (-10,000)* |
| Garage | 2 | 2 | 2 | *None (+50,000)* | 2 |
| Improvements | Tennis Court, Gazebo, Patio, Porch | Elevator, Decks, Open Porch | *Patio, Deck, Balcony, Open Porch (+5,000)* | *Porch (+35,000)* | *Patio, Deck, Porch (+15,000)* |
| Condition/ Quality[7] | Average/Good | *Good/Good (-385,000)* | *Good/Good (-675,000)* | *Average/Average (+390,000)* | *Good/Good (-612,000)* |
| Site Size[8] | 1.857 acres | *0.2448 Acres (+3,168,000)* | *0.34 Acres (+2,870,000)* | *0.6428 Acres (+1,922,000)* | *.4439 acres (+2,545,000)* |

[3] At $150 per SF (PSF).

[4] At $30,000 for a full bath; $15,000 for a half bath.

[5] $50,000 for finished; $25,000 for unfinished or partial finish; and $15,000 for half-bath in basement.

[6] At $10,000 per fireplace.

[7] By 10% of the sale price, which he deemed conservative since upgrades to the Subject would cost $300,000 to $600,000. Age was also included in this adjustment.

[8] In the report, the appraiser used $1,734,000 for lot size differences. Thus, the adjustments were +$2,796,000; +$2,630,000; +$2,105,000; +$2,450,000. At trial, he corrected the same to "$3,129,000 per acre for lot size differences under 1 acre and $939,000 for lot size differences over 1 acre," which

| Location | Excellent – Oceanfront | *Similar (+642,000)*[9] | *Inferior (+1,350,000)* | *Inferior (+780,000)* | *Inferior (+1,224,000)* |
|---|---|---|---|---|---|
| View | Good-Ocean View | Good-Ocean View | Good-Ocean View | Good-Ocean[10] View | Good-Ocean View |
| Total Adj.[11] | N/A | +$3,925,000 | +$3,714,000 | +$3,627,000 | +3,325,000 |
| Adj. Sale Price[12] | N/A | $7,775,000 | $10,464,000 | $7,525,500 | $9,445,000 |

The largest adjustment (over $1 million) was for differences in lot size. Plaintiffs' appraiser used a linear regression analysis wherein he extracted a value for what he deemed to be surplus land (because, as his report noted, "[a]ll of the [comparables'] lots support existing structures and various amenities, therefore the difference in lot sizes accounts primarily for some privacy and proximity to the neighboring houses") by a formula $y = mx+b$, where $b$ is the constant, $x$ is the lot size in excess of the constant, and $m$ is the variable, i.e., the value per-acre in excess of the constant. He used six vacant land sales (one of which was in Allenhurst, and one on the same street as the Subject) as samples, with the Allenhurst sale as the "constant" (since it was the smallest lot). He plotted the various sales manually (using the excel spreadsheet) to determine the value of land in excess of 0.4269 acres as follows:

| Location | Sale Date | Sale Price | Size (acres) | Size over 0.4269 acres | Value ($y=mx+b$) |
|---|---|---|---|---|---|
| 8 Allen Ave, Allenhurst | 6/30/2015 | $2,170,000 | 0.4269 | 0.0 | $2,228,907 |
| 28 Whitehall Ave, Deal | 2/28/2017 | $2,700,000 | 0.5438 | 0.1169 | $2,533,723 |
| 37 Parker Ave, Deal | 3/23/2017 | $3,300,000 | 1.0331 | 0.6062 | $3,809,573 |
| 80 Neptune Ave, Deal | 9/29/2017 | $1,750,000 | 0.5615 | 0.1346 | $2,579,876 |
| 62 Phillips Ave, Deal | 9/5/2018 | $3,000,000 | 0.6428 | 0.2159 | $2,791,886 |
| 72 Brighton Ave, Deal | 3/1/2019 | $4,160,000 | 0.7748 | 0.3479 | $3,136,066 |

---

then changed the adjustment amounts for each comparable as shown in the above grid. He testified that these changes did not alter his final value conclusion of $10,000,000.

[9] The upward adjustment was only because the effective tax rate in Monmouth Beach was higher ($1.202) than Deal ($0.71), Spring Lake and Allenhurst. The adjustments to the other comparables were for lack of ocean front at 20% of the sale price.

[10] The appraiser's notes to the grid state that comparable 3 had an "obstructed ocean view and was adjusted upwards by 10% of the sale price." The adjustment grid however does not reflect this addition.

[11] The amounts in this row changed due to the appraiser's changes during trial to the lot size adjustment. The "total adjustments" originally were +$3,553,000; +$3,469,000; +$3,810,000; and +$3,230,000.

[12] The amounts in this row changed due to the appraiser's changes during trial to the lot size adjustment. The "adjusted sale price" originally was $7,703,000; $10,219,000; $7,708,500; and $9,350,000.

His calculations provided an adjustment of $2,607,199 per acre, which he further adjusted by +20% because the Subject is oceanfront. This was $3,129,000 (rounded) which he applied to "lot differences under 1 acre." He used 30% of this amount or $939,000 (rounded) for a lot size over one acre. He testified he deemed the six vacant land sales as a sufficient sample size.

He explained his mathematical computation vis-à-vis his comparable 1 which has a lot size of 0.2448 acres thus: He split the Subject's 1.857 acres into one acre and 0.857 acres. The comparable was 0.7552 acres less than the Subject's one acre (1 minus 0.2448). He multiplied this difference (0.7552 acres) by $3,129,000 which produced $2,363,021 (rounded). He then multiplied the balance of the Subject's lot size (0.857 acres) by $939,000 which was $804,723. This amount plus $2,363,021, or $3,168,000 (rounded) was the upward adjustment to comparable 1's lot size.

Deal's appraiser used four sales he deemed were comparable, all located in Deal. He testified that given the nature, real-estate sophistication, and wherewithal of the community (wealthy) where homeowners used the residences as summer homes only, and transacted sales privately, Deal had a real estate market of its own because only certain players are (and can be) the buyers. He noted that regardless of the private nature of the sales, one could still obtain sale deeds and verify sale details from the assessor's records (including SR-1As) as well as from the attorneys. He also noted that vacant land sales demonstrated the high per-acre value of land in Deal.

Deal's appraiser's comparables included two vacant land sales. The vacant land sales were: (A) 8 Neptune Avenue, which sold 01/10/18 for $11,800,000. The lot size was 0.80 acres; and (B) 2 Beringer Road, which was oceanfront, and sold 10/03/17 for $14,200,000. The lot size was 1.53 acres. When sold, there was an improvement on it which was subsequently demolished. He did not increase the price for demolition costs having no information in this regard.

His two improved comparables were: (A) 1 and 5 Clem Conover Road, which sold 02/28/19 for $10,000,000. The property comprised two lots, totaling 1.40 acres, with 2,296 SF of GLA (four beds) and 5 full and one, half bath. The basement was partial with partial finish, and there was a 4-car tandem garage. It was built in 1980. He deemed its condition the same as the Subject's, i.e., good/good; (B) 9 Monmouth Terrace, which sold 12/21/17 for $9,000,000. This property had a lot size of 0.40 acres, 5,480 SF of GLA (five beds), four full and one half-bath, built in 2000 with a 2-car basement garage and a partial partially finished basement. He deemed its condition average/good.

To all four sales he adjusted for (1) surplus land (i.e., lot size differences) since each comparable was on a lot which could "accommodate one single family dwelling," and the excess could not "be developed separately and does not have a separate" HBU. Such surplus, his report noted could be used for "future expansion and amenities such as swimming pools, tennis courts" and the like. His report noted that vacant land sales 2 and 4 showed that the per-acre value of land was more than $9 million,[13] thus, he used 20% of $9 million or $1,800,000 per acre as the value of surplus land. This, times the lot size difference, provided the adjustment. For instance, his improved Sale One with 1.40 acres was adjusted upward by $828,000 which is the size difference of 0.46 acres (the Subject's 1.86 acres minus the comparable's 1.40 acres) times $1,800,000; (2) GLA (at $150 PSF); (3) bath count ($30,000 for full and $15,000 for half bath); (3) basement/finish at $50,000; (4) garage at $20,000; (5) condition by 10% of sale price; and (6) amenities at $50,000.

His adjusted sale prices for the four sales were $11,425,000; $14,905,000; $12,698,000; and $15,991,000, from which he concluded a value of $15,000,000.

---

[13] Sale 2 reflected a price per-acre at $14,750,000 ($11,800,000 sale price ÷ 0.80 acres lot size). Sale 4 reflected a price per-acre at $9,281,046 ($14,200,000 sale price ÷ 1.53 acres lot size).

**FINDINGS**

The court rejects plaintiffs' appraiser's comparables 1 and 2 located outside Deal. The court is unpersuaded by his opinion that municipalities such as Spring Lake or Monmouth Beach are competitive with, and no different than Deal. These towns, unlike Deal, are beach towns, i.e., summer destinations for the general public, thus invite traffic, noise, business, and entertainment. Hence, and unlike Deal, there are interspersed commercial establishments in Spring Lake and Monmouth Beach (the aerial picture of the property in Monmouth Beach, which appears to be a simulation, shows a filled-up parking lot across). Deal is purely residential except for the casino club. Therefore, and while some homes in Spring Lake and Monmouth Beach may also face the ocean (albeit, unlike in Deal, with a busy public access street and barriers between the homes and the ocean) and may have the same architectural design as the homes in Deal, the court is unpersuaded that they are fungible with homes in Deal, and thus competitive to Deal in real estate. That the sales in Deal are conducted privately does not equate to their being suspect (not at arms-length) or unverifiable especially when there is no evidence that Deal sales are not amongst knowledgeable sophisticated buyers and sellers. Indeed, the sale deeds of Deal's appraiser's comparables did not evidence any such shortcoming and showed the sellers as entities or trusts as were some of the buyers (whether during or after the purchase).

The court also rejects plaintiffs' appraiser's Sale 3, the ranch-style home in Deal (marked NU-10, sale by an estate or estate representative, see N.J.A.C. 18:12-1.1(a)(10)). It is too dissimilar to be comparable. A ranch is plainly not the mansion-type colonial style structure as the Subject. The pictures of its interior and exterior also evidence their significant differences. The gross adjustments are about 98% which resulted in doubling the property's sale price further evidencing non-comparibility.

The court rejects Deal's appraiser's two vacant land sales as comparables. Simply because the lots are in a residential zone, therefore, their use, as of the assessment date here, would have to be for

9

their improvement by a residence, does not mean that these are credible value comparables when the Subject's HBU is its present use, thus, as improved. His adjustments for non-existent improvements were conjectural, and his theory that adjustments should be made to convert vacant land into an improved one with all of the Subject's amenities, is not credible. The theory is a fallacy of the initial logic—vacant land can be used as a comparable for an improved property, the HBU of which is its use as improved.

This leaves plaintiffs' appraiser's sale 4 (in Allenhurst which occurred in 2018), and Deal's appraiser's two improved sales (sales 1 and 3), both in Deal one of which took place in 2019 and the other in 2017. Their adjusted sale prices were $9,445,000; $11,425,000 and $12,698,000. Each appraiser's largest adjustment was for lot size. The court finds Deal's appraiser's per-acre value at $9,000,000 more credible since it was based on two vacant lot sales in Deal (his sale comparables 2 and 4), which closer to the assessment date, with sale 4 being ocean front. In contrast, plaintiffs' appraiser's regression analysis required subjective adjustments since his vacant land sales were not oceanfront, and despite their smaller sizes, the more recent sales in Deal (62 Phillips Avenue and 72 Brighton Avenue) show that their actual sale prices exceeded his concluded opinion of value of one acre.[14]

The court is also not persuaded by both appraisers' conclusions that (1) the Subject is subdividable; and (2) lots in excess of the minimum buildable area should be automatically deemed as surplus less valuable acreage. There was no expert opinion or analysis as to the first point (such as from a planner or engineer). As to the second point, if the Subject was subdividable, then the excess land may be more valuable as excess land, and not necessarily less valuable as surplus land.

Nonetheless, the court does not need to analyze and choose one appraiser's lot size adjustment over another. Despite their disagreements on what an acre of vacant land would be worth (plaintiffs'

---

[14] Plaintiffs' appraiser's use of vacant land sales in Deal does not reconcile with his firm opinion that sales of improved homes in Deal are not usable for valuation because they are not marketed via MLS.

appraiser through his regression analysis of six vacant lot sales, five of which are in Deal, computing an acre of ocean front property to be worth $3,129,000, and Deal's appraiser opining the same one-acre ocean front lot to be at least $9,000,000 based on two vacant lot sales in Deal), and their method of computing lot size differences (plaintiffs' appraiser using a manually computed regression analysis and Deal's appraiser using 20% of $9,000,000), their ultimate site size adjustments were not that disparate. For instance, plaintiffs' appraiser's Allenhurst comparable has a lot size of 0.4439 acres which he adjusted by +$2,545,000. Deal's appraiser's improved Sale 3 (in Deal) has a lot size of 0.40 acres which he adjusted by +$2,628,000.[15] Similarly, the appraisers' other adjustments are almost identical (except for garage and location, the latter being only provided by plaintiffs' appraiser).

Giving most weight to the Deal sales and much lesser consideration to the Allenhurst sale, the court finds that the Subject's assessment is amply reasonable.

**CONCLUSION**

For the reasons stated above, the court affirms the assessment.

Very Truly Yours,

    /s/ Mala Sundar
Hon. Mala Sundar, P.J.T.C.

---

[15] Even if one computed the lot size differences under each respective appraiser's methodology, the difference is not widely disparate. For instance, if 1.413 acres, the lot size difference in plaintiffs' appraiser's Allenhurst sale and the Subject (1.857 acres Subject minus 0.4439 acres comparable), was multiplied by $1,800,000, (Deal's appraiser's adjustment for lot size difference), the resultant adjustment would be +$2,548,980. Plaintiffs' appraiser's adjustment was $2,545,000 under his regression analysis computation.

Similarly, if 1.457 acres, the lot size difference in Deal's appraiser's Sale 3 and the Subject (1.857 acres Subject minus 0.40 acres comparable) was computed under plaintiffs' appraiser's regression analysis as explained to the court, the resultant adjustment would be $2,682,123 (.60 acres x $3,129,000 or $1,877,400 plus 0.857 acres times $939,000 or $804,723). Deal's appraiser's adjustment was $2,628,000 (1.46 acres lot size difference x $1,800,000).

11